733 F.2d 1171
 5 Soc.Sec.Rep.Ser. 145, Medicare&Medicaid Gu 33,969
UNIVERSITY OF CINCINNATI, d/b/a Cincinnati General Hospital,
Plaintiff-Appellant,
v.
Margaret M. HECKLER, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 83-3078.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 25, 1984.
Decided May 14, 1984.
 
 Kenneth R. Faller, Cincinnati, Ohio, for plaintiff-appellant.
 Donetta D. Wiethe, Asst. U.S. Atty., Cincinnati, Ohio, Sarah Willis Wilcox (argued), Washington, D.C., for defendant-appellee.
 Before ENGEL, KRUPANSKY and WELLFORD, Circuit Judges.
 WELLFORD, Circuit Judge.
 
 
 1
 The appellant, the Cincinnati General Hospital (Cincinnati General), is operated by a state university, the University of Cincinnati (University), and is a provider of Medicare services under the federal Health Insurance for the Aged and Disabled Act (Act), 42 U.S.C. Sec. 1395, et seq. Cincinnati General appeals the order dismissing its complaint by the United States District Court for the Southern District of Ohio, Western Division, and affirming a final decision rendered by the Provider Reimbursement Review Board (P.R.R.B./Board), which denied Medicare reimbursement to Cincinnati General for interest paid on the Hospital's obligations to the University.
 
 
 2
 Cincinnati General, as a provider of Medicare services, is entitled generally to recover its reasonable costs of services provided to Medicare beneficiaries. See 42 U.S.C. Sec. 1395cc(a)(1) and Sec. 1395x(u). Initial determination of the reimbursement due a provider is delegated to fiscal intermediaries selected by the Secretary of Health and Human Services. See 42 U.S.C. Sec. 1395h(a). The Secretary's designated intermediary in this case is the Blue Cross Association/Blue Cross of Southwest Ohio (Blue Cross).
 
 
 3
 If the provider disputes a designated intermediary's determination of reimbursement costs within 180 days of the intermediary's decision and the amount in dispute exceeds $10,000.00, a de novo hearing by the Board may be obtained. 42 U.S.C. Sec. 1395oo (a), (d). A decision of the Board on the dispute is a final agency determination unless the Secretary sua sponte reverses, affirms or modifies the decision within sixty days. 42 U.S.C. Sec. 1395oo (f)(1). Jurisdiction for federal judicial review of the final action by the Secretary is vested in federal courts, and in this case, the district court affirmed the Secretary's decision to deny Cincinnati General's claim for interest reimbursement.
 
 
 4
 Cincinnati General is a general care public hospital and has historically been providing acute and general surgical services to low income recipients, including Medicare beneficiaries, in Cincinnati and its environs. It also provides acute surgical and medical care to area indigents who do not have eligibility for welfare, Medicaid and Medicare benefits.
 
 
 5
 The City of Cincinnati conveyed operational control of Cincinnati General to the University in 1961. A few years later, an agreement between the State of Ohio and the University resulted in the University becoming state-affiliated and therefore "deemed to be an instrumentality also of the state." Ohio Rev.Code Ann. Sec. 3349.33 (Page 1980). Following these two occurrences, the Board of Directors of the University became the ultimate administrative body for the University and the Hospital.
 
 
 6
 Cincinnati General was apparently not funded by the State of Ohio despite its state affiliation. It consequently depended upon patient care revenues in large measure for its economic support. During the early 1970's, the Hospital's financial position began to decline; by 1977, a serious cash-flow problem had developed, which it claimed threatened its continued economic viability. As a state instrumentality, the Hospital was precluded from negotiating loans with commercial sources. See Ohio Const., art. VIII, Sec. 3.
 
 
 7
 The University made available short-term investment funds to the Hospital and funded Cincinnati General from month to month during fiscal 1977. Interest was charged on these outstanding advances in an amount equal to the prevailing prime interest rate quoted by local banking institutions, which averaged 6.6 percent during fiscal 1977. While the Secretary determined that this rate was "reasonable," she did not intervene in the disallowance of the interest expense reimbursement, based upon the relationship between the University and Cincinnati General under 42 C.F.R. Sec. 405.419. Appellant challenges the interpretation of this regulation, the substance of which provides, in pertinent part, that:
 
 
 8
 (b)(3)(ii) [Interest] be paid to a lender not related through control or ownership or personal relationship to the borrowing organization ....
 
 
 9
 (c)(1) To be allowable, interest expense must be incurred on indebtedness established with lenders or lending institutions not related through control, ownership, or personal relationship to the borrower. (Emphasis added.)
 
 
 10
 At issue is the claim of interest reimbursement by Cincinnati General of $931,310.00 in interest paid in fiscal 1977 to the University. The net reimbursement effect of this amount is estimated at $278,000.00 Blue Cross disallowed the claim and the Hospital made a timely request to the P.R.R.B. for de novo review of the intermediary's decision.
 
 
 11
 On May 19, 1981, the Board issued its decision after a full hearing. Based on 42 C.F.R. Sec. 405.419, which it noted was drafted to prevent reimbursement of "collusive loans with inflated interest rates that are designed to benefit enterprises associated with Provider," the Board concluded that the language of the regulations precluded the reimbursement.[1] The Board also found "that the loans were not evidenced by any documentation."
 
 
 12
 The district court carefully reviewed the record, relevant regulations and precedential court opinions and reluctantly concluded to affirm the decision of the Secretary. On this appeal, our scope of review is governed by the jurisdictional statute, 42 U.S.C. Sec. 1395oo (f), which provides that an appeal of a final decision by the Board must be pursued under the judicial review portions of the Administrative Procedure Act (APA), 5 U.S.C. Sec. 701 et seq. The APA provides that federal courts "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning of applicability of the terms of an agency action." 5 U.S.C. Sec. 706. Under the APA, a court of review may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A).
 
 
 13
 In making a determination of the action by P.R.R.B. and the Secretary, it must be recognized that an administrative agency's interpretation of its own regulation is accorded considerable deference on judicial review unless it is inconsistent with the terms of the regulation, especially in areas like Medicare reimbursements. See, e.g., Loma Linda University v. Schweiker, 705 F.2d 1123, 1126 (9th Cir.1983); Abbott-Northwestern Hospital, Inc. v. Schweiker, 698 F.2d 336, 340 (8th Cir.1983); Chesire Hospital v. N.H.-V.T. Hospitalization Service, 689 F.2d 1112, 1117 (1st Cir.1982).
 
 
 14
 There is no question that the rate of interest reimbursement sought is reasonable, if it is allowable at all. See 42 C.F.R. Sec. 405.419(c). Nor does the Secretary challenge the basis of the claim that the funds advanced were utilized to satisfy a financial need of the provider and for a purpose related to patient care. See 42 C.F.R. Sec. 405.419(a) and (b). The Secretary urges that portions of (b) and (c) of the regulation, which preclude reimbursement between related entities, however, are necessary to effectuate the purposes of the Medicare statute and to limit potential collusion and unfair dealing between the provider and a related lender.
 
 
 15
 We are directed in this appeal to the qualifications established by subsection (c)(1), which provide that the general rule of reimbursement of the reasonable cost of services is not applicable where loans are executed between related entities. The University and Cincinnati General are certainly related entities. On appeal, the Secretary asserts that the general rule admits of no relevant qualification or exception. The validity of Reg. 405.419 has been considered in Jackson Park Hospital Foundation v. United States, 228 Ct.Cl. 448, 659 F.2d 132, which held that subsection (c) bars all interest, "not so much because of the nature of the transaction for which the loan is obtained but because of the source of the loan .... The Secretary considers it more likely that, when a loan is made between unrelated parties bargaining at arms length, the interest rate will prove reasonable and the loan itself necessary." Id. at 138. Thus, the court concluded that "the across-the-board scope of Sec. 405.419(c) is reasonable," and that the Secretary was not required to "examine the bona fides and reasonableness of the loan," because this was "precisely the kind of investigation the regulation is designed to avoid." Id. at 138, 139. This court considered the same regulation in Shaker Medical Center Hosp. v. Secretary of Health and Human Services, 686 F.2d 1203 (6th Cir.1982), and rejected the argument that it was arbitrary and capricious to condemn all related loans, and likewise rejected the claim that "the Secretary should be required to scrutinize the costs line-by-line and item-by-item in every transaction between related entities." Id. at 1209. The basis for this court's Shaker ruling was stated:
 
 
 16
 [I]t is within the power of an agency to promulgate prophylactic regulations which are broad in scope in order to effectuate the purposes of the enabling legislation. Mourning v. Family Publications Service, 411 U.S. 356, 372-73, 93 S.Ct. 1652, 1662, 36 L.Ed.2d 318 (1973). The regulations at issue in this appeal reasonably support the legitimate goals of avoiding payment of collusive or improperly increased costs with a minimum of administrative burden. While the prophylactic regulations might prove "in particular cases to be 'underinclusive' or 'overinclusive,' in light of [their] presumed purpose, nonetheless [they are] ... widely accepted response[s] to legitimate interests in administrative economy and certainty of coverage for those who meet [their] terms." Weinberger v. Salfi, 422 U.S. 749, 776, 95 S.Ct. 2457, 2472, 45 L.Ed.2d 522 (1975) (discussing a prophylactic statutory rule). Our inquiry in reviewing the regulations and their applications is whether the agency in following its statutory directives "could rationally have concluded both that the particular limitation or qualifications would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule." Id. at 777, 95 S.Ct. at 2472. We conclude that the regulations satisfy this standard.
 
 
 17
 There is little doubt that a line-by-line, item-by-item examination of the costs in every transaction between related parties could prove to be expensive and time consuming, thereby reducing the amount of funds available for the payment of services. Further, the danger of collusive or improperly increased costs in transactions involving related entities is particularly great. Under proper standards of review, these regulations must be upheld as valid. See, e.g., Jackson Park Hospital, supra, 659 F.2d at 136-37; Goleta Valley Community Hospital v. Schweiker, supra, 647 F.2d at 897 (9th Cir.1981).
 
 
 18
 Id. at 1209-10 (emphasis added).
 
 
 19
 In Shaker, this court did go further and placed the burden on the provider to prove the "bona fides" of the transaction and to prove whether there were "special circumstances" justifying an exception to the rule against allowance of costs arising out of related entity transactions, citing Indiana University v. United States, 223 Ct.Cl. 88, 618 F.2d 736 (1980), and other cases which dealt with rent or interest reimbursement claims in respect to related entities. It concluded that "[t]he burden is on the provider to 'keep its house in order' and justify its expenses to the Secretary." Shaker, 686 F.2d at 1210. This court noted, furthermore, that "Indiana University involved very special circumstances, and after that case was decided the Court of Claims upheld the validity of Sec. 405.419. Jackson Park Hospital Foundation v. United States [228 Ct.Cl. 448], 659 F.2d 132, 137 (Ct.Cl.1981)." Id. at 1209.
 
 
 20
 Indiana University is similar in many respects to this controversy. In that case the relationship of the University to the State was observed as "unique":
 
 
 21
 They are state teaching hospitals [Indiana University Hospitals], but receive no money from the State for their operations. Although the State of Indiana provides funds for the University, State law prohibits the use of any of these funds for the hospital. Since the hospitals are not a separate legal entity, they cannot borrow money from outside the University.
 
 
 22
 618 F.2d at 737 (emphasis added).
 
 
 23
 The Court of Claims created an exemption from the "prophylactic" regulation, which generally bars reimbursement of interest payments to related persons without the necessity of the Secretary making inquiry into the particular circumstances involved, cf. Pasadena Hospital Ass'n. v. United States, 223 Ct.Cl. 72, 618 F.2d 728 (1980), because of the "particular and unusual circumstances." Indiana University, 618 F.2d at 740.[2]
 
 
 24
 We can only surmise how important the circumstance was in Indiana University that state law precluded state funds for a state university operated hospital. In the instant case, the record is silent as to any similar Ohio law prohibition[3] that would prevent state money from flowing into Cincinnati General, where the City retained its ownership. The State of Ohio, Hamilton County, or the City of Cincinnati on this record may well have been a source of necessary funds for Cincinnati General's operations, unlike the Indiana University Hospital situation where it, according to the Court of Claims, was prohibited from using any state funds for its operation.[4]
 
 
 25
 The district court in this case made no reference as to whether the University was, as a matter of fact or as a matter of law, the sole source from which Cincinnati General might obtain necessary funds. It did find that Regulation 405.419 was "in conformity, not at variance" with statutory purposes and that subsection (c) represented "an attempt by the Secretary to assure that only reasonable costs will be reimbursed, while at the same time avoiding an unreasonable administrative burden." Thus, despite the fact that the district court found that "there was a valid and bona fide loan between the University and plaintiff, notwithstanding that the agreement was not evidenced in writing," it concluded "reluctantly" that the regulation at issue prohibited reimbursement because "the danger of collusive loans is, in the Secretary's view, unreasonably high" in that "the loans involved were between parties related through control."
 
 
 26
 One of the principal cases relied upon by the district court to reach its conclusion was Goleta Valley Community Hospital v. Schweiker, 647 F.2d 894 (9th Cir.1981). We also find the following language of the Goleta case, which also involved a non-profit hospital corporation provider of Medicare services, to be persuasive:
 
 
 27
 Once a determination has been made that the organizations are related, the Board need not inquire into whether the reimbursements claimed were reasonable because Regulation 405.427 operates as a prophylactic rule and defines any charges in excess of actual cost as per se unreasonable. Marina Mercy Hospital v. Harris, 633 F.2d 1301 at 1304 (9th Cir.1980); American Hospital Management Corp. v. Harris, supra, 638 F.2d at 1212. We have recently found that:
 
 
 28
 [p]articularly in a program as complex and ripe with potential for abuse as Medicare, the Secretary has broad discretion to control excessive costs by adopting general prophylactic rules which, despite their inherent imprecision, eliminate the need for a cumbersome and expensive process of adjudicating item-by-item the reasonableness of costs.
 
 
 29
 Marina Mercy Hospital v. Harris, supra, 633 F.2d at 1304.
 
 
 30
 The Hospital also challenges the validity of Regulation 405.427 and Regulation 405.419. The Hospital argues that the application of these regulations automatically to deny reimbursement is contrary to both the Medicare Act and the United States Constitution. We have recently upheld both the statutory and constitutional validity of Regulation 405.427 by finding that the regulation is reasonably related to achieving a permissible objective. American Hospital Management Corp. v. Harris, supra, 638 F.2d at 1212, 1213. "The classification of 'related entity' ... was established to prevent the reimbursement of excessive charges resulting from self-dealing ...." Id. at 1213. The related entity classification was a reasonable method of achieving this objective. Id. The same related entity classification is used in Regulation 405.419 for exactly the same purpose: to ensure that entities deal with each other at arm's length. Thus, we find that Regulation 405.419 is also valid.
 
 
 31
 647 F.2d at 897.
 
 
 32
 We recognize that there is contrary authority to the Goleta ruling that Regulation 405.419 constitutes an absolute prohibition against related entity interest reimbursement claims. In Northwest Hospital, Inc. v. Hospital Service Corp., 687 F.2d 985 (7th Cir.1982), the court considered an interest reimbursement claim and concluded that "the blanket disallowance of related-party interest expense contained in section 405.419(c) is broader than either the language or the purpose of the Medicare statute ...."; thus, it allowed the 4% per annum interest rate on "15-year promissory notes," although the loan was between related entities. Id. at 992, 995-96. See also South Boston General Hospital v. Blue Cross of Virginia, 409 F.Supp. 1380 (W.D.Va.1976). Compare Caylor-Nickel Hosp. v. Califano, CCH Medicare and Medicaid Guide p 29,619 (No. F-77-83, N.D.Ind. Mar. 1, 1979).
 
 
 33
 We conclude with some reluctance, as did the district judge, that the regulation in question precludes the interest reimbursement claim of Cincinnati General in this case. This Circuit in Shaker upheld the regulation in question as valid, and appellant concedes that it is valid; although the Shaker court did recognize that there may be an exception in very special circumstances. "Line-by-line, item-by-item examination ... in every transaction between related entities" would doubtless be a heavy burden to impose upon the Secretary in cases of this kind. Further, the "danger" of "improperly increased costs" in these transactions is "particularly great" as determined in Shaker.
 
 
 34
 The question addressed by other courts in making exceptions to the regulation or holding it invalid, because of concern over a constitutional issue that is involved in subsection (c) of the regulation, is simply not a question that has been addressed in this case. No religious order is involved here. Appellant has not raised this as a challenge to the validity of Regulation 405.419 in its brief nor in its reply brief. We do not, therefore, consider this to be a reason to find an exception to the disallowance of interest reimbursement involving related entities. We perceive that, for reasons stated, there are differences between the situation in the Indiana University case and in the instant case, including resources for operating funds of Cincinnati General not available to the Indiana University Hospital.
 
 
 35
 Since we affirm the district court on the basis of the preclusive effect of 42 C.F.R. Sec. 405.419, we need not address in detail the further issue raised by the Secretary in this case. Suffice it to say that in this case, "[t]here existed no note or other proper writing which purported to serve as a 'legal instrument' which created the legal obligation to repay the money" advanced by the University to Cincinnati General. Appellant's Brief at 8. There was, as conceded by appellant, simply "an open line of credit with no stated ceiling" (nor any stated interest rate involved). Appellant's Brief at 8. This, of course, is an entirely different situation from that which existed in Northwest Hospital and in South Boston General Hospital, cases which challenged the applicability of the regulation in question to the related-party transactions there involved.
 
 
 36
 We are not prepared to overrule the contrary judgment of the district court in this case, and establish a precedent that public or non-profit hospitals for Medicare purposes may draw on funds held by a related entity on an open line of credit basis, without any loan documentation, and thereby obtain reimbursement for interest at prevailing prime interest rates. The circumstances in this case differ from those in which other courts have reached a contrary decision, even Indiana University, where it was clear that there was no other source of revenue for the University hospital but the University itself.
 
 
 37
 The judgment of the district court is accordingly AFFIRMED.
 
 
 38
 KRUPANSKY, Circuit Judge, dissenting.
 
 
 39
 Because I believe that the majority has mistakenly interpreted 42 C.F.R. Sec. 405.419(c)(1) as an absolute prophylactic rule, I must dissent.
 
 
 40
 The medicare act entitles providers to reimbursement for covered services based on "the reasonable costs of such services". 42 U.S.C. Sec. 1395f(b)(1). The standards for determining the reasonable cost of services provided to medicare patients are concisely enumerated by the act:
 
 
 41
 The reasonable cost of any services, shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions.
 
 
 42
 42 U.S.C. Sec. 1395x(v)(1)(A).
 
 
 43
 Pursuant to this specific statutory delegation, the Secretary promulgated a series of regulations which define the procedure to be implemented and items included in the determination of reimbursable expenditures. Of immediate application to this appeal is the rule codified as 42 C.F.R. Sec. 405.419. This regulation addresses the interest expenses of medicare providers; in part, it reads as follows:
 
 
 44
 (a) Principle. Necessary and proper interest on both current and capital indebtedness is an allowable cost ....
 
 
 45
 (b) Definitions. (1) Interest. Interest is the cost incurred for the use of borrowed funds.... This is usually for such purposes as working capital for normal operating expenses....
 
 
 46
 (2) Necessary. Necessary requires that the interest:
 
 
 47
 (i) Be incurred on a loan made to satisfy a financial need of the provider. Loans which result in excess funds or investments would not be considered necessary.
 
 
 48
 (ii) Be incurred on a loan made for a purpose reasonably related to patient care.
 
 
 49
 (iii) Be reduced by investment income except where such income is from gifts and grants ....
 
 
 50
 (3) Proper. Proper requires that interest:
 
 
 51
 (i) Be incurred at a rate not in excess of what a prudent borrower would have had to pay in the money market existing at the time the loan was made.
 
 
 52
 (ii) Be paid to a lender not related through control or ownership or personal relationship to the borrowing organization ....
 
 
 53
 (c) Borrower-lender relationship. (1) To be allowable, interest expense must be incurred on indebtedness established with lenders or lending organizations not related through control, ownership, or personal relationship to the borrower. Presence of any of these factors could affect the "bargaining" process this [sic ] usually accompanies the making of a loan, and could thus be suggestive of an agreement on higher rates of interest or of unnecessary loans. Loans should be made under terms and conditions that a prudent borrower would make in arms length transactions with lending institutions. The intent of this provision is to assure that loans are legitimate and needed, and that the interest rate is reasonable. Thus, interest paid by the provider to ... related organizations of the provider would not be allowable....
 
 
 54
 (2) Exceptions to the general rule regarding interest on loans from controlled sources of funds are made .... if a provider operated by members of a religious order borrows from the order, [then] interest paid to the order is an allowable cost.
 
 
 55
 On this appeal, the Secretary has urged that Sec. 405.419 in an absolute prophylactic regulation designed to effectuate the medicare statute which is the genesis of the promulgation of the rule. Patently, this regulation is not as sweeping in effect as the Secretary has argued. The regulation defines the general rule of subsection (b)(3)(ii), that reimbursable interest must be "interest ... paid to a lender not related" to the provider; thereafter, subsection (c) of the regulation explicates the rule and provides specific exceptions to the application of that general rule. One such exception, not at issue on this appeal, concerns providers affiliated with sectarian institutions. 42 C.F.R. Sec. 405.419(c)(2).[1]
 
 
 56
 Fairly construed, subsection (c)(1) provides that the general rule is not applicable to loans which are executed in accordance with "terms and conditions that a prudent borrower would make in arms length transactions with lending institutions" so long as the "loans are legitimate and needed, and ... the interest rate is reasonable". In this case, as the majority has noted, it is conceded by all parties that the loans to Cincinnati General by the University were legitimate and necessary. It is further conceded that the interest rate, settled at the prevailing prime rate, was manifestly reasonable. Finally, the terms and conditions of this loan bear all the characteristics reflective of those which the hospital could have obtained in an arm's length transaction with a commercial lending institution.[2]
 
 
 57
 Of course, these are factual issues left to the determination of the Secretary, not a federal review court. However, here the P.R.R.B. concluded, "[f]aced with the severe cash problems [the hospital] was required to turn to the University of Cincinnati 'to avoid financial disaster' " and, that "the interest rate was reasonable, and, in fact, well below the going market rate". The Secretary has accepted the Board's Hearing Decision with modification.
 
 
 58
 On this appeal, the Secretary has asserted that the general rule admitted to no relevant qualification or exception, i.e., that its purpose is exclusively prophylactic. This interpretation conflicts with the express language and structure of the regulation and it is therefore not entitled to dispositive deference. I.N.S. v. Stanisic, 395 U.S. 62, 72, 89 S.Ct. 1519, 1526, 23 L.Ed.2d 101 (1969). See also Batterton v. Francis, 432 U.S. 416, 425-26, 97 S.Ct. 2399, 2405-06, 53 L.Ed.2d 448 (1977). It is obvious from an examination of the very language of Sec. 405.419 that it does not reflect a bright-line prophylactic rule, but merely illuminates the parameters of a "relatively undefined accounting principle", to wit, that a provider is entitled "to claim all necessary and proper interest expense" as a reimbursable cost of providing services to medicare beneficiaries. See Abbott-Northwestern Hospital, Inc. v. Schweiker, 698 F.2d 336, 341 (8th Cir.1983).
 
 
 59
 Similarly, the court in Northwest Hospital Inc. v. Hospital Services Corp., 687 F.2d 985 (7th Cir.1982) (all judges of the circuit concurring), viewed subsection (c) of Sec. 405.419 as explicating the blanket rule in Sec. 405.419(b) and outlining the scope of that rule. 687 F.2d at 989 ("405.419(c) explains the justification for and scope of this exclusion"). The Seventh Circuit in Northwest Hospital has aptly observed that "the statute specifically creates the right to judicial review of the Secretary's adverse ruling on what costs are reimbursable, thus reserving to the courts the final authority to interpret this aspect of the statute". Id. at 991, quoting St. John's Hickey Memorial Hospital v. Califano, 599 F.2d 803, 813 (7th Cir.1979) [emphasis added]. Thus in Northwest Hospital the interpretation of Sec. 405.419 instantly advanced by the Secretary was not accorded precedence.
 
 
 60
 The Northwest Hospital court additionally noted that the intent of the rule, according to the regulatory language, was "to assure that loans are legitimate and needed, and that the interest rate is reasonable." Id., 687 F.2d at 992. In that case, as in the case at bar, there was no dispute that the loans were necessary and that the interest charged was reasonable. The Seventh Circuit rejected the Secretary's claim that, notwithstanding the settled bona fideness of the transactions at issue, Sec. 405.419 prohibited recovery of interest expenses; the court concluded that "application of the related-party disallowance to the loan transaction involved in this case is inconsistent with the rationale offered for the regulation" in Sec. 405.419(c).
 
 
 61
 Other courts have also articulated this result by concluding that the regulation is a broadly worded prohibition with certain narrow exceptions provided for in subsection (c). See Jackson Park Hospital Foundation v. United States, 228 Ct.Cl. 448, 659 F.2d 132 (1981); South Boston General Hospital v. Blue Cross of Virginia, 409 F.Supp. 1380 (W.D.Va.1976). Of particular relevance to the cause herein under review is Trustees of Indiana University v. United States, 223 Ct.Cl. 88, 618 F.2d 736 (1980). In that case the providers were non-profit hospitals affiliated with a state university, they were not funded by the state but depended on patient revenues for operating funds, and were prohibited by law from borrowing from commercial lenders and claimed as medicare reimbursement interest paid on loans from the university at a below-market rate of interest. The Indiana University court construed the regulation to have created a narrow exception to the preclusion of the interest charged by the affiliated university.
 
 
 62
 Additionally, contrary to the majority's view, this circuit's opinion in Shaker Medical Center Hospital v. Secretary of Health and Human Services, 686 F.2d 1203 (6th Cir.1982), is readily distinguished from this case. In Shaker, the medicare provider had claimed reimbursement for depreciation and interest expenses resulting from the purchase of a hospital building. On the appeal, the Shaker provided had challenged the propriety and application of two of the Secretary's regulations promulgated pursuant to the "reasonable cost" statute, 42 U.S.C. Sec. 1395x(v)(1)(A), supra, namely 42 C.F.R. Sec. 405.427 and 42 C.F.R. Sec. 405.419. The latter being the regulation at issue in the case before this court.
 
 
 63
 Of primary concern to the Shaker panel was Sec. 405.427, which creates an exception to the general rule that depreciation on buildings is a reimbursable cost. This regulation, however, generally excludes reimbursement of "costs applicable to ... facilities ... furnished to the provider by organizations related to the provider by common ownership or control". 42 C.F.R. 405.427. Section 405.427 also incorporates a proviso which permits reimbursement of "related-party" depreciation costs if such costs are shown "not to exceed the price of comparable" furnishings available from non-related organizations. The Shaker panel concluded therefrom that the qualified restriction of Sec. 405.427 "[e]ssentially ... seeks to insure that the costs reimbursed in such situations do not exceed what the costs would be if the provider obtained the services from an unrelated organization". 686 F.2d at 1205. Thus, in purpose and effect, Sec. 405.427 parallels Sec. 405.419. The Shaker court was not, however, required to evaluate the contours of that similarity because it had concluded that the loan was not demonstrably bona fide and necessary. Because there was no bona fide transaction at issue, the Shaker court did not have an occasion to examine the breadth of Sec. 405.419, but appropriately confined its analysis to the issue presented to it.
 
 
 64
 Finally, on appeal, the Secretary argued, and the majority effectively holds, that although the necessity and propriety of the loans at issue had been investigated, and despite the affirmative conclusion of the Secretary that the loans were not collusive, improper, nor unnecessary and the interest reasonable, this court should nonetheless relieve the Secretary from the burden of conducting an investigation designed to verify the requirements of the enactments. Even were the regulation's proscription as comprehensive as claimed by the Secretary, this court should not acquiesce in the wasteful and foolish endeavor of protecting the Secretary from that which the Secretary has undertaken voluntarily. I would therefore reverse the district court and remand the cause with instructions to return the matter to the Secretary for a determination of the reimbursable amount due appellant on the rejected interest claim.
 
 
 
 [1]
 Despite its conclusion, the Board also found that:
 [N]one of the evils are present in the instant case, ...: 1) Neither party had a profit motive, 2) the University could have received a greater return on its money by investing it elsewhere, 3) the interest rate was reasonable, and, in fact, well below the going market rate, and 4) the University was the sole source of the loan money.
 
 
 [2]
 The Court of Claims also reached its conclusion allowing reimbursement because it wished to avoid what it perceived to be "serious questions under the first amendment, which generally prohibits the government from giving special favored treatment to a religious entity." 618 F.2d 740. Regulation 405.419(c)(1) has an exemption for interest paid to a religious order by members of the order
 
 
 [3]
 This, of course, is a different prohibition from that common to both Indiana and Ohio that precluded the state agency hospital from borrowing from commercial sources
 
 
 [4]
 The Court of Claims in Indiana University found that "the University was the sole source the hospitals could turn to for operating capital." While the Review Board made the same finding that the University of Cincinnati was the "sole source of loan money" for Cincinnati General, nowhere does it state that the City of Cincinnati, or Hamilton County, or the State of Ohio were prohibited from charter or by state law from providing needed funds
 Indeed, Cincinnati Municipal Code, Chapter 705, Section 705-19, provides, in pertinent part:
 [T]he board [of the University of Cincinnati] shall prepare for review of the city council and the commissioners of Hamilton County a program budget for the future financing of the capital needs and the operating costs of the [Cincinnati] General Hospital, including the capital needs of the divisions of the College of Medicine which are essential to the effective operation of the hospital. This budget shall take into account all appropriate resources from the United States government, the State of Ohio, the County of Hamilton, the City of Cincinnati, and all private sources available.
 At any time during each five year period when forecasts indicate that the estimated hospital income shall be insufficient to cover estimated expenses or costs required to permit the rendering of high quality medical care in a sensitive and responsive manner, there shall be joint discussions by the university board, the city and the county, to determine possible sources of additional income .... (Emphasis added.)
 We recognize that if these entities provided needed funds to Cincinnati General through loans (as opposed to grants, for example), Regulation 405.419 would bar reimbursement of interest payments between "related parties."
 
 
 [1]
 Subsection (c)(2) has not been challenged on this appeal and the majority has appropriately declined to comment on its validity. It is worth noting, however, that the religion-based exception is broadly worded and seems to be an abdication by the Secretary of the authority to examine the bona fides and necessities of loans, which would be subject to review in instances involving interest payments made by a secular provider
 
 
 [2]
 Indeed, even if state law permitted the hospital to seek commercial loans, it is open to question whether an institution confronted with the financial burdens that threatened its existence would be capable of securing a loan at any rate of interest. On this issue, the Secretary argued that the probable unavailability of cooperative commercial lenders would force Cincinnati General "to face hard choices about its operations" and would have thus precluded a medicare interest claim. It appears that this argument was intended to persuade the court that the within loan was not reflective of an arm's length commercial transaction. In view of the fact that Cincinnati General's "hard choice" in this case would be to close its doors, the argument is contrary to the intent of the Act, which is to promote and ensure services to medicare recipients. Moreover, the regulation itself does not consider the availability of commercial loans, but is instead concerned with preventing collusive agreements for unnecessary loans at extraordinary interest rates. Accordingly, for the purpose of this appeal, it is appropriate to concentrate on the expressed purpose and intent of the regulations