**MEDICAL REHABILITATION SERVICES, P.C., a Michigan corporation, Plaintiff–Appellant,**

v.

**Donna SHALALA, Secretary of Health and Human Services, Defendant–Appellee.**

No. 93–1043.

United States Court of Appeals, Sixth Circuit.

Argued and Submitted Jan. 19, 1994.

Decided Feb. 22, 1994.

Alice M. MacDermott, Logan & Associates, Bingham Farms, MI (briefed), for plaintiff-appellant.

Kathleen Bradley, Dept. of Health and Human Services, Office of Gen. Counsel, Region V, Chicago, IL (argued and briefed), Pamela J. Thompson, Asst. U.S. Atty., Detroit, MI, for defendant-appellee.

Before: KENNEDY, MILBURN, and GUY, Circuit Judges.

KENNEDY, Circuit Judge.

Medical Rehabilitation Services, P.C., ("MRS" or the "provider") appeals the District Court's grant of summary judgment to the Secretary of Health and Human Services (the "Secretary"). MRS sought review in the District Court of the final decision of the Provider Reimbursement Review Board (the "PRRB" or the "Board"), which found that Blue Cross and Blue Shield of Michigan's ("Blue Cross" or the "intermediary") adjustments to MRS' Medicare cost reports for the periods ending December 31, 1984 and May 31, 1985 were proper. The specific adjustments at issue are (1) the disallowance of a claim for the reimbursement of bad debts, and (2) the decrease of the total Medicare charges, increase in the total patient charges, and increase in the amount of interim payments reported by MRS on the cost reports. For the reasons that follow, we affirm the judgment of the District Court.

## I.

### A.  Medicare Reimbursement Procedures

This case arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., commonly known as the Medicare Act. The Medicare program, which primarily provides medical benefits to eligible persons over the age of 65, consists of two parts: Part A, which serves as "hospital insurance", covering hospital and post-hospital extended care services; and Part B, which serves as "supplementary medical insurance", covering medical and other health services. Medicare providers are reimbursed by the Medicare program through private organizations acting as "fiscal intermediaries" under contract with the Secretary.

Medicare beneficiaries are responsible for paying deductible and coinsurance amounts. Where a Medicare beneficiary is also a Medicaid recipient, a state Medicaid agency may pay the Medicare deductibles and coinsurance for its recipients as part of its Medicaid program.

Under the Medicare Act, the Secretary prescribes methods for determining a provider's "reasonable cost" of providing services to Medicare beneficiaries. These methods are found in regulations, guidelines, letters and other binding publications including the Provider Reimbursement Manual (the "Manual"). The intermediary determines the provider's reasonable cost based upon an annual cost report submitted by the provider. Because a provider's actual reasonable cost of services cannot be determined until the end of the provider's cost report period, interim payments are made to the provider on at least a monthly basis.

The intermediary subjects a provider's cost report to an "initial retroactive readjustment," a field or desk audit and "final retroactive readjustment," which reconciles a provider's total allowable costs with its interim payments and any deductible and coinsurance payments it received from beneficiaries to determine the provider's reimbursement. The provider is notified of the intermediary's determination in a written notice known as a "notice of program reimbursement" ("NPR").

A provider that is dissatisfied with an intermediary's determination is entitled to a hearing before the PRRB so long as the amount in controversy is $10,000 or more and the provider makes a timely request within 180 days of the date that the NPR was mailed to the provider. 42 U.S.C. § 1395oo (a); 42 C.F.R. · §§ 405.1835(a), 405.1841(a). The PRRB's decision may be reversed, affirmed, or modified by the Secretary. 42 U.S.C. § 1395oo (f). The district court has jurisdiction to review a final reimbursement decision by the PRRB or the Secretary, id., pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 et seq.

### B.  Facts of the Case

MRS, a Medicare provider located in southeastern Michigan, provided physical and speech therapy, which are Part B services, to patients at the Van Buren Convalescent Center ·("Van Buren") and other skilled nursing facilities ("SNF").[1] MRS filed cost reports with Blue Cross for services rendered at Van Buren during the fiscal years ending November 30, 1984 and FYE May 31, 1985.[2] Blue Cross performed an audit of the cost reports and sent MRS a NPR letter dated October 7, 1986. On March 25, 1987, MRS requested a hearing before the Board because it was dissatisfied with some of the intermediary's adjustments. At the hearing, two issues remained after settlement discussions. The first was whether Medicare was liable for deductible and coinsurance amounts, related to services rendered by MRS at Van Buren, that were paid by the state Medicaid program to Van Buren but never received by MRS because of Van Buren's bankruptcy. The second issue concerned the propriety of the intermediary's

---

1.  MRS also provided these services at two of its own outpatient clinics.

2.  MRS was terminated from the Medicare program by the Health Care Financing Administra-tion, which administers the program for the Secretary, on June 1, 1985 for non-compliance with provider participation requirements. MRS later reentered the Medicare program.

adjustments, which decreased the total Medicare charges and increased the total patient charges and interim payments reported by MRS.

On May 29, 1991, the Board issued its decision, finding for the Secretary on both issues. The Board found that because the state Medicaid agency had paid Van Buren for coinsurance and deductibles, as it was obligated to do under its Medicaid program, the amounts were not allowable as bad debts under section 322 of the Manual. Regarding the total patient charges, the Board found that the intermediary's decision to rely on the provider's patient logs rather than the provider's revenue logs for the determination of total patient charges was consistent with the Secretary's regulations. The Board also found that the intermediary had properly relied on its own records of Medicare charges rather than those reported by MRS. Finally, the Board found that Blue Cross had properly adjusted the interim payments reported by MRS. On March 19, 1992, the Administrator of the Health Care Financing Administration ("HCFA") declined to review the PRRB's decision, making the Board's decision the final decision of the Secretary. 42 U.S.C. § 1395oo (f)(1).

On March 23, 1992, MRS sought review of the Board's decision in the United States District Court for the Eastern District of Michigan. In a ruling from the bench, the court affirmed the Board's decision in all respects. The court held that section 322 of the Manual, which declares that where a Medicaid program must pay Medicare coinsurance and deductibles, such amounts are not allowable bad debts under the Medicare program, applies to both Part A and Part B services. Hearing Tr. 12/3/92 at 38. It believed that the provider's losses were due to the failure of Van Buren to reimburse MRS and that the provider's claim must lie against Van Buren. Id. at 39. The court further held that the intermediary's other adjustments were supported by substantial evidence and were neither arbitrary and capricious nor contrary to law. Id. MRS then appealed to this Court.

## II.  Standard of Review

When reviewing agency action, this Court must affirm unless the action is arbitrary and capricious, contrary to law, or unsupported by substantial evidence. 5 U.S.C. § 706(2). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 147 (6th Cir.1990) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). Great deference is generally owed to an agency's interpretation of its own regulations. *Fox v. Bowen*, 835 F.2d 1159, 1162 (6th Cir.1987). "In making a determination of the action by [the PRRB] and the Secretary, it must be recognized that an administrative agency's interpretation of its own regulation is accorded considerable deference on judicial review unless it is inconsistent with the terms of the regulation, especially in areas like Medicare reimbursements." *University of Cincinnati v. Heckler*, 733 F.2d 1171, 1173–74 (6th Cir.1984). A reviewing court may not "reverse an agency 'simply because it would have interpreted the [regulation] in a different manner.'" *Bedford County Gen. Hosp. v. Heckler*, 757 F.2d 87, 90 n. 1 (6th Cir.1985) (quoting *Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977)).

## III.  Bad Debt Claim

### A.

MRS provided Part B services to residents of Van Buren from October 1980 through November 1982. Medicare reimbursed MRS for 80% of the reasonable cost of such services for the MRS patients who were Medicare beneficiaries. Most of the patients at Van Buren were also Medicaid recipients. In Michigan, the state Medicaid program covers Medicare deductibles and coinsurance for its beneficiaries. As the law existed when this case arose, rehabilitation agencies such as MRS were prohibited from treating long-term-care patients in their own facilities. Such services could only be provided in a long-term-care facility and those providing the services were required to bill

Medicaid through the facility.[3] Medical Assistance Program Bulletin No. 5390–82–01, State of Michigan; Admin.Rec. at 238. MRS submitted Medicaid claims to the state under Van Buren's Medicaid provider number. The state paid approximately $243,000 to Van Buren on these claims. Van Buren, however, did not in turn pay MRS this money.

Van Buren filed for bankruptcy on September 8, 1981. MRS recovered approximately $70,000 as a preferred creditor in the bankruptcy proceedings. MRS then filed a claim against the State of Michigan in the state court of claims for the balance of its claim. Subsequently, counsel for MRS advised that it would be best to withdraw this claim after counsel learned that the Michigan Department of Social Services, which administers the Medicaid program, was considering filing suit to set aside the final order of the bankruptcy court, including the $70,000 award to MRS. MRS withdrew the claim. MRS then posted this loss in its Medicare cost reports as a bad debt and sought reimbursement under 42 C.F.R. § 405.420.

### B.

Bad debts are reductions in a provider's revenue, not actual costs incurred in the delivery of medical services, and are not included as allowable costs under the Medicare program. 42 C.F.R. § 405.420(a).[4] However, Medicare providers will be reimbursed for deductible and coinsurance amounts that the provider is unable to collect from beneficiaries. *Id.* § 405.420(a), (b)(1). The reason for allowing providers to recover these amounts appears at 42 C.F.R. § 405.420(d), which states:

Under [Medicare], costs of covered services furnished beneficiaries are not to be borne by individuals not covered by the [Medicare] program.... Uncollected revenue related to services rendered to beneficiaries of the program generally means the provider has not recovered the cost of services covered by that revenue. The failure of beneficiaries to pay the deduct-

ible and coinsurance amounts can result in the related costs of covered services being borne by other than [Medicare] beneficiaries. To assure that such covered service costs are not borne by others, the costs attributable to the deductible and coinsurance amounts which remain unpaid are added to the [Medicare] share of allowable costs. Bad debts arising from other sources are not allowable costs.

As this provision provides, not all bad debts will be reimbursed by Medicare as allowable costs. Only bad debts that are "attributable to the deductible and coinsurance amounts that remain unpaid" and meet the following criteria are allowable:

*Criteria for allowable bad debt.* A bad debt must meet the following criteria to be allowable:

(1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2) The provider must be able to establish that reasonable collection efforts were made.

(3) The debt was actually uncollectable when claimed as worthless.

(4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

42 C.F.R. § 405.420(e). In the present case, the Secretary argues that the debt owed to MRS is not attributable to the failure of a beneficiary to pay deductible and coinsurance amounts. Here, these amounts were paid for the Medicare beneficiaries by Michigan's Medicaid program. As the Secretary sees it, the debt in this case arose not from the failure of beneficiaries to pay deductibles and coinsurance but instead from the failure of Van Buren to pay MRS. Thus, under the first prong of section 405.420(e), this debt is not an allowable bad debt that is reimbursable under the Medicare program. While there may be merit to this argument because it appears that MRS and Van Buren are co-providers, we need not reach this issue be-

---

3. The law was subsequently changed and rehabilitation agencies may now bill Medicaid directly. Hearing Tr. 12/3/92 at 8.

4. Any citations to the Code of Federal Regulations will be to the regulations in effect at the time of the 1984 and 1985 cost reports.

cause we believe section 322 of the Manual, which operates as an exception to the general rules for allowable bad debts, applies here.

Under section 322, where a state Medicaid program is obligated either by statute or under the terms of the program to pay Medicare deductible and coinsurance, those amounts are not allowable as bad debts under Medicare.

Section 322 provides in full:

### 322. MEDICARE BAD DEBTS UNDER STATE WELFARE PROGRAMS

Prior to 1968, [State Medicaid plans] under the Federal medical assistance programs were required to pay the Part A deductible and coinsurance amounts for inpatient hospital services furnished through December 31, 1967. Any such deductible or coinsurance amounts not paid by the State were not allowable as a bad debt.

Effective with the 1967 amendments, States no longer have the obligation to pay deductible and coinsurance amounts for services that are beyond the scope of the [State Medicaid plan] for either categorically or medically needy persons. For example, a State which covers hospital care for only 30 days for Medicaid recipients is not obligated (unless made part of the [State Medicaid plan]) to pay all or part of the Medicare coinsurance from the 61st day on. For services that are within the scope of the [State Medicaid plan], States continue to be obligated to pay the full deductible and coinsurance for categorically needy persons for most services, but can impose some cost sharing under the plan on medically needy persons as long as the amount paid is related to the individual's income or resources.

Where the State is obligated either by statute or under the terms of its plan to pay all, or any part, of the Medicare deductible or coinsurance amounts, those amounts are not allowable as bad debts under Medicare. Any portion of such deductible or coinsurance amounts that the State is not obligated to pay can be included as a bad debt under Medicare, provided that the requirements of § 312 or, if applicable, § 310 are met.

In some instances, the State has an obligation to pay, but either does not pay anything or pays only part of the deductible or coinsurance because of a State payment "ceiling." For example, assume that a State pays a maximum of $42.50 per day for SNF services and the provider's cost is $60.00 a day. The coinsurance is $32.50 a day so that Medicare pays $27.50 ($60.00 less $32.50). In this case, the State limits its payment towards the coinsurance to $15.00 ($42.50 less $27.50). In these situations, any portion of the deductible or coinsurance that the State does not pay that remains unpaid by the patient, can be included as a bad debt under Medicare, provided that the requirements of § 312 are met.

If the State is not participating under [federal law], but State or local law requires the welfare agency to pay the deductible and coinsurance amounts, any such amounts are not includable in allowable bad debts. If neither the [federal] plan nor State or local law requires the welfare agency to pay the deductible and coinsurance amounts, there is no requirement that the State be responsible for these amounts. Therefore, any such amounts are includable in allowable bad debts provided that the requirements of § 312 [5] or, if applicable, § 310 [6] are met.

5. *§ 312. INDIGENT OR MEDICALLY INDIGENT PATIENTS*

Providers can deem Medicare beneficiaries indigent or medically indigent when such individuals have also been determined eligible for Medicaid as either categorically needy individuals or medically needy individuals, respectively.

Manual, § 312.

6. *§ 310. REASONABLE COLLECTION EFFORT.*

To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amount must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients. It must involve the issuance of a bill ... to the party responsible for the patient's personal financial obligations. It also includes other actions such as subsequent billings, collection letters and telephone calls or personal contacts with this party which constitute a genuine, rather than a token, collection effort. The provider's collection effort may include using or threatening to use court action to obtain payment.

Manual, § 10.

MRS argues that section 322 applies only to Part A services and as MRS is a provider of Part B services [7], section 322 has no application in this case. It bases this argument on the "plain language" of the section and on a 1983 revision that omitted a prior reference to both Part A and Part B bad debt.

As the Secretary points out, the reference to Part A in the first paragraph of the 1983 version of section 322 is a historical reference to pre–1968 federal requirements that mandated payment of Part A deductibles and coinsurance by state Medicaid plans. The next paragraph informs that later requirements omitted this mandate. Thus, from 1968 forward, state Medicaid plans were not *required* to pay Part A Medicare coinsurance and deductibles. Where a state chooses to include the payment of Medicare coinsurance and deductibles, in whole or in part, as part of its Medicaid plan such covered amounts continue to be excluded as bad debt. The reference in the first paragraph does not exclude Part B Medicare charges from section 322's coverage.

MRS also argues that the 1983 version omitted any reference to Part B and that the "obvious inference to be drawn" from this omission is that the Secretary intended to exclude Part B bad debts from the purview of section 322. The 1983 version of section 322 deleted the following sentence: "Therefore, any such amounts uncollectable from the beneficiary under either Part A or Part B are includable in allowable bad debts," and replaced it with the following: "Therefore, any such amounts are includable in allowable bad debts provided that the requirements of § 312 or, if applicable, § 310 are met." We decline to draw the inference suggested by MRS and instead believe that the change was merely stylistic and not substantive.

Furthermore, under the 1983 version of section 322, state Medicaid is still obligated to pay Medicare deductible and coinsurance for services within the scope of Title XIX (Medicaid), and services covered under Title XIX include charges that are reimbursed under both Part A and Part B of the Medicare program. Finally, even if we were to disagree with the Secretary, we are operating under a highly deferential standard of review under which we defer to the Secretary's interpretation of her department's regulations, where, as here, the interpretation is neither arbitrary nor inconsistent with the regulation. We hold that section 322 applies to both Part A and Part B Medicare costs. Thus, because Michigan is obligated to pay Medicare deductibles and coinsurance for its Medicaid recipients, these amounts, which were paid by the state, are not allowable bad debts under section 322 and MRS is not entitled to Medicare reimbursement.

## IV. Other Adjustments

Blue Cross reconciled the total Medicare charges shown in the cost reports with the total Medicare charges recorded by Blue Cross and adjusted the provider's 1984 total Medicare charges by about $15,600 and the 1985 total Medicare charges by about $22,500. In its audit of the 1985 cost report, Blue Cross reviewed the total reported patient charges and concluded they were understated. Blue Cross increased the provider's 1985 total patient charges by about $9,000. Blue Cross also increased the provider's reported interim payments for 1984 by $7,000 and those for 1985 by about $30,000.

The Board affirmed the intermediary's adjustments. The District Court held that MRS had failed to show that the Board's decision was arbitrary, capricious, contrary to law or unsupported by substantial evidence. Motion Hearing Tr. 12/3/92 at 40. The court further held that the intermediary was entitled to engage in the offsetting procedure it employed when adjusting the provider's interim payments. *Id.*

### A. Total Charges [8]

■ MRS produced detailed computer logs, created by its accountant by recon-

---

7. We note that MRS, which operates two outpatient clinics, is also a provider of Part A services. The services at issue here, however, fall under Part B.

8. "Total charges" consist of all charges for a type of service, including Medicare charges, Medicaid charges, and private insurance charges. "Total

structing the provider's entire revenue log, to verify its purported gross patient charges and gross Medicare charges. Blue Cross had agreed at a 1985 exit conference to accept the charges as reported by the accountant, however, it ultimately relied on its own records of what Medicare charges had been submitted by MRS and the reimbursement MRS received for those periods. MRS complains that Blue Cross improperly decreased its total charges when it relied on this data instead of relying on the data submitted by MRS as had been agreed. The Board found that the data relied upon by Blue Cross validated both the total Medicare charges and the total patient charges as determined by Blue Cross.

As part of the reimbursement process, intermediaries are required to report all Medicare charges submitted by a provider along with any reimbursement for those charges in Provider Statistical and Reimbursement Reports ("PS & R reports"), compiled quarterly. Intermediaries must use these reports to check amounts on a provider's annual cost report. Intermediaries must also send the provider a Provider Summary Report for the PS & R reports used by the intermediary. The provider is then afforded the opportunity to furnish proof that the summary is inaccurate. If the provider fails to show any inaccuracies, the intermediary will then rely on the PS & R report to adjust the charges reported in the provider's cost report.

In the present case, Blue Cross gave MRS the PS & R reports for the 1984 and 1985 cost report periods along with the summaries; MRS has not established that the PS & R reports or summaries were inaccurate. MRS argues instead that the adjustments were incorrect solely because Blue Cross represented that it would accept and rely on MRS' data for the 1984 and 1985 cost report periods.

The intermediary's decision to rely on actual patient charges as recorded in the provider's patient charge logs is consistent with the Social Security Act and relevant regulations. Section 1815(a) of the Act provides that no payments to providers can be made unless the provider "has furnished such in-

formation as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period." 42 U.S.C. § 1395g(a). Nothing in the statute limits the type of information the Secretary may rely on in determining the amount of payments due to a provider.

## B. Interim Payments

■ The Board affirmed the intermediary's increase in the amount of the interim payments reported by the provider in the cost reports at issue. The Board's decision was based upon its finding that Blue Cross had paid interim payments to MRS and supplied copies of the cancelled checks. The Board also concluded that Blue Cross had properly applied some of the interim payments that MRS claimed were missing against the amounts MRS owed to the Medicare program from prior cost reports and advance payments. Blue Cross asserts that this decision is supported by substantial evidence.

MRS contends that Blue Cross failed to pay all of the payments due during 1984. The record supports the finding that Blue Cross either issued interim payments directly to MRS or applied them against debts that MRS owed to the Medicare program. MRS argues that Blue Cross "illegally" suspended its interim payments from May through November 1985 by engaging in this offsetting procedure.

A Medicare intermediary must make interim payments to participating providers "no less often than monthly." 42 C.F.R. § 405.-454(b). Payments may be withheld from a provider only when the intermediary has determined that a provider has been overpaid and when the provider has been given notice of such overpayment. 42 C.F.R. § 405.370. MRS alleges that interim payments were withheld when neither of these conditions were satisfied. On June 1, 1985, MRS was terminated as a Medicare provider; the record does not indicate when MRS was recertified. Blue Cross did issue payments to MRS

Medicare charges" refer to charges to beneficia-       ries that are covered by Medicare.

post-termination. It does not, however, consider these payments to be interim payments, which would be subject to the requirements of 42 C.F.R. §§ 405.454(b) and 405.370, because interim payments are made only to participating providers. After its termination, MRS was no longer a participating provider.

## V.

The Board's decision upholding the intermediary's adjustments was neither arbitrary, capricious, nor contrary to law and was supported by substantial evidence. We therefore AFFIRM the judgment of the District Court, which affirmed the Board's decision.