**UNITED STATES of America, Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

**No. 88–0987–CV–W–5.**

United States District Court,
W.D. Missouri, W.D.

April 23, 1990.

Alleen S. Castellani and Vernon A. Poschel, U.S. Attorney's Office, Kansas City, Mo., and Roger J. Marzulla and Elizabeth A. Edmonds, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for plaintiff.

Robert L. Driscoll, Stephen J. Owens and Lindsay L. Wood, Stinson, Mag & Fizzell, Kansas City, Mo., for defendant.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

This is an action by the United States at the behest of the Environmental Protection Agency against Ford Motor Company for penalties in excess of 50 million dollars and injunctive relief. Plaintiff alleges Ford has emitted volatile organic compounds ("VOCs") in excess of allowable from its Claycomo plant coating operation in violation of the Clean Air Act of 1970, 42 U.S.C. § 7401 *et seq.*

Before the Court is plaintiff's motion for summary judgment on its complaint, defendant's cross-motion for summary judgment on plaintiff's complaint, and plaintiff's motion to dismiss defendant's counterclaim. For the reasons to follow, plaintiff's motion for summary judgment on its complaint is denied, defendant's motion for summary judgment on plaintiff's complaint is granted, and plaintiff's motion to dismiss defendant's counterclaim is granted.

Because this action is brought on behalf of the EPA and because the EPA is intimately involved in the factual background of this case, the Court, for the sake of

clarity, will often refer to the EPA as if it were the actual plaintiff in this case.

# I. MOTIONS FOR SUMMARY JUDGMENT

## A. *Background*

In an automobile or light-duty truck assembly plant, vehicles are coated (i.e. painted) in what is commonly referred to as "the paint shop." The coating process generally proceeds in three phases. First, the vehicles are given a prime coat. The purpose of the prime coat is to help prevent corrosion and to create a receptive surface for the topcoat. There are several methods of applying the prime coat. Some prime coats are applied by spraying them on the surface of the vehicle. These are called spray-primes. Ford uses the spray-prime method of application at its Claycomo plant. Second, a "topcoat" is applied. The topcoat is the coating which gives the vehicle its distinctive color. Finally, after the vehicle is assembled, further applications of topcoat are made as necessary to repair defects which occur in the painting or assembly process. This touching-up process is known as "final repair."

As a general rule, all coatings used in the automobile manufacturing process contain VOCs. Inevitably, volatile organic compound emissions occur during the vehicle coating process. Coatings are generally applied to vehicles through spray guns which can either be operated manually or by automatic controls. When a coating is sprayed, a portion of the resultant fog makes contact with and adheres to the vehicle surface. As this portion of the sprayed coating dries, the solvent evaporates and the VOCs are released into the air. Absent the use of hardware-type emissions controls such as incinerators or carbon absorbers, the VOC's in the solvent are exhausted from the paint shop and into the air outside the assembly plant where they contribute to the formation of ozone.

There are two principal factors that control the amount of VOC's emitted during the coating process: (1) the VOC content of the paint being applied, and; (2) the amount of coating that is sprayed from the spray guns in order to produce a properly coated vehicle.

Although the impact the VOC content of paint has on emissions is relatively straightforward, one principle should be noted. When a solvent-borne coating with a greater VOC content is substituted for a solvent-borne coating with a lesser VOC content, the relative amount of VOC's emitted using the higher VOC coating will not be in direct proportion to the relative difference in VOC content of the two coatings. It will be greater. There are two reasons for this. First, a given volume of the higher VOC coating will release more VOC's than the same volume of the first coating. Second, because increasing the VOC content of the substitute coating causes a corresponding decrease in its solids content, a greater volume of the substitute coating will have to be used to apply the same amount of solids as applied using the original lower VOC coating.[1]

An additional factor relevant to the amount of coating that needs to be sprayed to properly coat a vehicle is "transfer efficiency." Transfer efficiency is the ratio of the portion of solids in sprayed coatings which adhere to a vehicle to the total solids sprayed. Transfer efficiency is important because it determines how much of a coating with a given solid and VOC content will have to be sprayed in order to achieve the requisite amount of solids on a vehicle. Thus, for any coating, the lower the transfer efficiency the greater the amount (in gallons) of coating that will have to be sprayed in order to properly paint the vehicle. The inverse also holds true.

## B. *The Clean Air Act and The Missouri Implementation Plan*

In the 1950s and 1960s, the responsibility for improving the nation's air quality fell

---

**1.** Coatings may be considered as consisting of two types of ingredients: solids and solvents. The solids consist of pigments and resins designed to adhere to the vehicle surface. The solids provide color and protection for the

prime coat. The solvents are the liquid media which make possible the application of the solids to the vehicle surfaces. To a greater or lesser extent, all solvents contain VOC's.

primarily to the states, with the federal government playing only a minor role. However, over the years there was increasing criticism of the states' efforts to attain clean air. To help insure the goal of a cleaner environment would eventually come to pass, Congress enacted the 1970 amendments to the Clean Air Act ("the Act"). While the amendments greatly increased the federal government's role, they by no means eliminated the states' responsibility for improving air quality. Indeed, the Act expressly preserved the principle "that the prevention and control of air pollution at its source is the primary responsibility of States and local governments...." § 101(a)(3), 42 U.S.C. § 7401(a)(3). *See also Train v. Natural Resources Defense Council,* 421 U.S. 60, 64, 95 S.Ct. 1470, 1474, 43 L.Ed.2d 731 (1975). Thus, the most significant change brought about by the Act was that the states and the federal government were now to be partners in the fight against air pollution.

The division of labor within this partnership was straightforward and logical. Section 109 of the Act required the agency charged with administering the Act, the Environmental Protection Agency, to establish air quality standards ("National Ambient Air Quality Standards or NAAQS"). As the first step in the process, EPA published lists identifying emissions that were reasonably believed to endanger public health and welfare. EPA then issued air quality criteria for each listed pollutant. § 108(a), 42 U.S.C. § 7408(a). Finally, EPA, following statutory procedures and timetables, promulgated NAAQS for each listed pollutant. These NAAQS limit the emissions of each pollutant to a level consistent with the achievement and maintenance of the desired air quality. § 109(a), 42 U.S.C. § 7409(a). Ozone is one such pollutant.[2] After it established the

NAAQS for each pollutant, the role of the EPA was secondary and that of the states became primary. *Train,* 421 U.S. at 79, 95 S.Ct. at 1481.

Section 110 of the Act required the states to adopt implementation plans ("State Implementation Plans or SIP's") for attaining the standards set by EPA. 42 U.S.C. §§ 7409, 7410; *Train,* 421 U.S. 60, 64–67, 95 S.Ct. 1470, 1474–1476 (1975). By giving the EPA authority to set threshold standards and to reject implementation plans that are ill-designed to achieve and maintain such standards, Congress ensured that states could not compete unfairly for industry by offering lenient air requirements. *United States v. Ford Motor Co.,* 814 F.2d 1099, 1102 (6th Cir.), *cert. denied,* 484 U.S. 822, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987); *Dequesne Light v. EPA,* 698 F.2d 456, 471 (D.C.Cir.1983).

At the same time, however, Congress recognized that the state was in the best position to determine how best to achieve the national goals in light of local needs and conditions. Therefore, the EPA may not reject a SIP unless it finds it fails to satisfy the substantive provisions of the Act, the principle provision being that the plan be designed to attain national standards as quickly as possible. § 110(a)(2)(A)–(K), 42 U.S.C. § 7410(a)(2)(A)–(K). "[S]o long as the ultimate effect of a State's choice of emission limitations is in compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation." *Train,* 421 U.S. at 79, 95 S.Ct. at 1482.[3]

To speed process towards attainment, Congress in the Clean Air Act Amendments of 1977 added section 107(d), 42 U.S.C. § 7407(d). Paragraph 1 of that sec-

---

**2.** On February 8, 1979, the Administrator of EPA promulgated, pursuant to Section 109(a) of the Clean Air Act, 42 U.S.C. § 7409(a), a combined primary and secondary NAAQS for ozone. *See* 40 C.F.R. § 40.9.

**3.** Congress also recognized that, because of advances in technology and changing local conditions, states would occasionally wish to revise

their original implementation plans. The EPA may reject these SIP revisions, but its authority to do so is no greater than its authority to reject an original SIP. A state's proposed revision must be approved, therefore, unless if fails to satisfy one of the requirements set out in § 110(a)(2) governing the evaluation of original SIPs. § 110(a)(3)(A), 42 U.S.C. § 7410(a)(3)(A).

tion required each state, within 120 days, to submit to the EPA a list of attainment areas (areas in which the air quality standards had been attained), nonattainment areas, and areas that could not be classified either way on the basis of available information. Another new section, section 172, 42 U.S.C. § 7502, prescribed new, more stringent requirements for state implementation plans in nonattainment areas. The states were given until January 1, 1979, to submit their section 172 plans for such areas.

Attainment and unclassifiable areas were made subject to section 163 of the 1977 amendments, 42 U.S.C. § 7473, which was designed to prevent any significant deterioration in air quality. Attainment and unclassified areas also remained subject to the pertinent requirements of the 1970 amendments. Complying with section 163 by preventing significant deterioration in the existing quality of the air was easier than complying with section 172, whose purpose was to raise air quality standards above existing levels. However, as the amendments clearly explain, the states still have the primary responsibility for establishing the proper mix of emission limits to reach the goals of the new amendments.

Portions of Kansas City were designated as nonattainment areas. One requirement of section 172 was that existing sources in each nonattainment area (such as Ford) would have to achieve a level of emission reductions reflecting the implementation by each source of "Reasonably Available Control Technology" ("RACT"). It therefore became necessary for states to determine what constituted RACT for the various sources of pollution in their nonattainment areas. Because the EPA had more expertise in evaluating control technology for various sources, the EPA published a series of documents entitled Control Technology Guidelines ("CTG's") to aid the states in establishing RACT guidelines. For each source category (in our case, auto/light-duty truck), the CTG's described the nature of the industrial process, including its emission characteristics, and set out the then currently available technology for controlling the emissions. These CTG's would be rebuttably presumed by the EPA to constitute RACT for affected facilities. However, upon a sufficient showing, recommendations for levels of control different than those recommended in the CTG's could be approved by the EPA.

In its CTG for automobile/light-duty truck, the EPA decided to center on reducing the VOC content of the paint itself. The EPA's research showed that "waterborne" coatings had considerably less VOC content than solvent-borne coatings because of the use of water instead of VOC's for a significant portion of the solvent content in the coating. At the time the CTG was prepared, the waterborne technology had been in use for at least three years on vehicles being produced and sold in competition with other vehicles, and the plants using these coatings had been successfully retrofitted. Accordingly, EPA concluded that waterborne technology was RACT. § 172(b)(3). EPA's recommended emission level for prime coating was 1.9 lbs. VOC/gal. coating; the recommended emission level for topcoats was 2.8 lbs. VOC/gal. coating; and the recommended emission level for final repair coatings was 4.8 lbs. VOC/gal. coating.

Because many manufacturers were using higher VOC-content solvent-borne coatings, they requested that rather than developing coatings with VOC contents equivalent to waterborne, they might wish to comply on an equivalency basis. "Equivalency" is a method of compliance where the source uses a coating in which the VOC's exceed the required limits, but where the excess VOC is compensated for by some combination of measures which offset that increase and which result in no greater emissions.

One such method is the use of transfer efficiency "credits". In order to obtain this credit, a company must demonstrate that the transfer efficiency it is achieving in actual practice is greater than the transfer efficiency generally associated with the coatings that form the basis for the emission limits: in our case, waterborne coatings.

The expected transfer efficiency is known as the "baseline" transfer efficiency. Accordingly, to calculate the credit, one must know the actual transfer efficiency and the baseline transfer efficiency. For a given value of actual transfer efficiency, the lower the baseline transfer efficiency the greater the offsetting credit the source can claim, and the higher the baseline transfer efficiency the smaller the credit the source can claim. In the mid-1970's it was believed that the baseline transfer efficiency for waterborne coatings was 50%. Time proved that estimate optimistic. The original estimate was revised downward to 40% in early 1979, and eventually settled at 30% in April of 1979.

At about the same time the EPA settled on 30% for the baseline transfer efficiency of waterborne coatings, the State of Missouri was in the process of adopting regulations to cover the auto and light-duty truck coating operations in the state. At that time, Ford used solvent-borne coatings and, accordingly, proposed an equivalent emission plan. To address the issue of Ford's equivalency demonstration, the Missouri Department of Natural Resources requested a meeting with EPA. At that meeting, Ford proposed an equivalent emission limit for its Kansas City plant. About all that remains undisputed about that meeting is that it was held April 6, 1979 at EPA's office in Durham, North Carolina. We do know that Ford proposed to use solvent-borne coatings with no more than 3.2 lbs. VOC/gal. for spray prime and 3.6 lbs. VOC/gal. for topcoat. What the relevant transfer efficiency was to be, however, is hotly contested. EPA claims the above limits would only have been approved at a transfer efficiency of 50%. Ford contends the transfer efficiency was to be 30%. Nevertheless, either transfer efficiency at this VOC-level would permit emissions greater than waterborne equivalence. Consequently, it was incumbent upon Ford to convince EPA that additional emissions reductions to bring Ford into exact equivalence with waterborne coatings were not economically feasible. This, the parties agree, Ford accomplished. The emission limits set out above, without reference to transfer efficiency, were subsequently submitted to EPA in the proposed Missouri SIP on July 2, 1979. EPA conditionally approved the Kansas City plan on October 25, 1979. 44 Fed.Reg. 61364 (October 25, 1979).

10 C.S.R. 10–2.230, entitled "Control of Emissions from Industrial Surface Coating Operations," is the portion of the Missouri SIP that contains the emission limits just discussed. The provision provides, in pertinent part, as follows:

(1) Application. This regulation shall apply only in Clay, Jackson, and Platte Counties.

(2) General

(A) No person shall emit to the atmosphere any volatile organic compounds (VOC) from any surface coating operation in excess of the amount allowed in section (3). This section will apply to any application area, flashoff area and oven used in coating operations.

(B) The emission limits contained in section (3) shall be an arithmetic average of all coatings, delivered to the coating applicator on a coating line.

(C) Compliance with the emission limits specified in section (3) may be demonstrated by the implementation of a plant-wide emission compliance plan which utilizes a daily weighted average of emissions from a combination of affected source operations, provided that—

(1) all source operations involved in the plan are subject to the emissions limits of this rule;

(2) all source operations are part of the same installation;

(3) the total actual volatile organic compound emissions for each twenty-four (24) –hour period do not exceed the sum of the allowable emissions determined from section (3) for each source operation for the same period;

(4) equivalent emission reductions are accomplished in the time intervals allowed in section (3) as would be required for individual source operations; and

(5) the plan is approved by the director.

(3) Emission Limitations.

### Surface Coating Emission Limits

| Surface Coating Process | Emission Limit lb/gal Coating (minus water) | Date of Compliance |
|---|---|---|
| * | * | * |
| Auto/light duty truck | | |
| Ford Motor Company | | |
| Prime | | |
| with electrocoat | 1.2 | 12/31/82 |
| Spray Prime | 3.2 | 12/31/83 |
| Topcoat (Truck) | 3.6 | 12/31/85 |
| Topcoat (Passenger) | 3.6 | 12/31/86 |
| Final Repair (Truck) | 4.8 | 12/31/85 |
| Final Repair (Passenger) | 4.8 | 12/31/86 |

10 C.S.R. 10–2.230 was ultimately approved by the EPA. 45 Fed.Reg. 24140 (April 9, 1980).

A plain reading of the text of this provision reveals that Ford could comply with the Missouri SIP either of two ways. The obvious method of compliance would be to adhere to the express emission limits negotiated at the Durham meeting that are set out in 10–2.230(3). Alternatively, Ford could avail itself of the alternate compliance provision of 10–2.230(2)(C) by submitting an alternate compliance plan ("ACP") to the Missouri Department of Natural Resources ("MDNR"). This option would be particularly attractive to sources with multifaceted operations that have some operations with emissions greater than allowable and some operations with emissions lower than allowable because the source could average its emissions over a given time period and calculate compliance on a plant-wide basis rather than operation by operation as required by 10–2.230(3).

Irrespective of the fact that Ford had recently negotiated the emission limits in 10–2.230(3), Ford decided to take advantage of the latter option. On April 4, 1985, Ford submitted an ACP to the MDNR. That plan set out the following emission limits at a stated baseline transfer efficiency of 30% for the coating process:

| Surface Coating Process | Emission Limit (Lb/Gal) | Compliance Date |
|---|---|---|
| Passenger Spray Prime | 3.2 @ 30% TE | 12–31–83 |
| Passenger Topcoat | 3.6 @ 30% TE | 12–31–86 |
| Commercial Spray Prime | 3.2 @ 30% TE | 12–31–83 |
| Commercial Topcoat | 3.6 @ 30% TE | 12–31–85 |

The ACP was formally approved by the director of the Missouri Department of Natural Resources (MDNR) on May 23, 1987, although the evidence before the Court is undisputed that the MDNR considered the plan to be approved and in full force and effect as to Ford's Claycomo plant by the middle of 1985.[4]

**4.** The Director cites inadvertence for the two year delay between approval by the department and the forwarding of a formal letter of approval for the director's signature. The affidavit evidence submitted in this regard reveals the MDNR approved the plan in mid–1985 and con-

## C. *Standard of Review*

Federal Rule of Civil Procedure 56(c) requires "the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The burden on the party moving for summary judgment "is only to demonstrate ... that the record does not disclose a genuine dispute on a material fact." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op.*, 838 F.2d 268, 273 (8th Cir.1988).

Once the moving party has done so, the burden shifts to the non-moving party to go beyond his pleadings and by affidavit or by "depositions, answers to interrogatories, and admissions on file" show that there is a genuine issue of fact to be resolved at trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. Evidence of a disputed factual issue which is merely colorable or not significantly probative, however, will not prevent entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In ruling on a motion for summary judgment, this Court must view all facts in a light most favorable to the non-moving party, and that party must receive the benefit of all reasonable inferences drawn from the facts. *Robinson v. Monaghan*, 864 F.2d 622, 624 (8th Cir.1989). If "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," this Court must grant summary judgment. Fed.R.Civ.P. 56(c).

## D. *Analysis*

The United States alleges that the defendant has operated its plant at Claycomo, Missouri, in violation of the emission limits for the spray prime, top coat (truck), top coat (passenger), final repair (passenger) and final repair (truck) as set out in 10 C.S.R. 10–2.230(3). EPA has not alleged that Ford is in violation of the ACP. Ford has raised compliance with the ACP as an affirmative defense to liability. The United States alleges Ford has been in violation of the SIP since January 1, 1985 as to its spray prime operation, January 1, 1986, for its truck operation and January 1, 1987 for its passenger car operation: the dates set in the SIP for compliance.

EPA presents compelling evidence that Ford has been operating in violation of the SIP over the time period at issue. It is on this basis that EPA moves for summary judgment. Ford, on the other hand, presents compelling evidence that it is in compliance with the Missouri ACP. Ford rests its motion for summary judgment on this contention. Obviously, the question of which of the two compliance plans controls is of critical importance in addressing the instant motions. Before we reach this issue, however, some background on EPA's claim is necessary.

Once an original or revised SIP is approved by the EPA, it becomes federal law and is enforceable in one of two ways. Under either method, the first step is for the EPA to issue a Notice of Violation ("NOV"). If the violation continues 30 days after the NOV, and the EPA cannot through negotiations reach some agreement with the polluting source, the EPA may enforce the SIP either by issuing an administrative order under § 120, 42 U.S.C. § 7420, or by instituting an enforcement action under § 113, 42 U.S.C. § 7413. Section 113 provides for injunctive relief as well as awards of civil penalties of up to $25,000 per day. Criminal penalties for knowing violations are also authorized. § 113(c).

Under § 120, the administrative mechanism, fines begin to accrue upon the issuance of the Notice of Noncompliance and

sidered it to control Ford's obligations under the SIP.

are intended to offset the economic benefit to the company of delaying compliance. *Dequesne Light*, 698 F.2d at 464. Under § 113, the mechanism employed in this case, the EPA must bring an enforcement action in the district court to collect penalties. The court is given the responsibility of determining the amount of penalties to assess, taking into consideration such factors as the seriousness of the violation and the economic impact of the penalty on the business. § 113(b).

The *prima facie* elements of a § 113 claim are:

(1) the defendant is a person;

(2) subject to an applicable SIP;

(3) that owns or operates a stationary source;

(4) the person has violated a requirement of the applicable SIP;

(5) has received notice of the violation from EPA; and

(6) has continued to violate the requirement of the SIP for more than 30 days after issuance of the Notice of violation.

■ There is no dispute but that Ford is a "person" as that term is defined in the Act, that Ford is subject to an applicable SIP, and that Ford owns the Claycomo plant at issue. The primary issue is the applicable SIP. Is it the emission limits set out in 10–2.230(3) (hereinafter section (2)(B)) (EPA's position), or is it the ACP adopted by the state pursuant to 2–2.-230(2)(C) (hereinafter Section (2)(C)) (Ford's position)? The resolution of this threshold

issue will answer the majority of questions posed by the parties.

The Court concludes the Section (2)(C) ACP is the applicable compliance plan. The SIP provides for the adoption of ACPs in subsection (2)(C), the EPA approved this provision of the SIP without comment, Ford's ACP was adopted pursuant to that provision, and the MDNR approved the ACP (although the exact date of adoption is a question that will require resolution). Thus, the plain language of the provision compels the conclusion that Ford's compliance or noncompliance must be measured against the ACP.

EPA's arguments to the contrary do not undermine this conclusion. Initially, the EPA contends that it has final approval authority over ACPs approved by the MDNR and that it did not approve this ACP.[5] This argument, however, ignores the plain language of section (2)(C). Section (2)(C) could not be clearer. Approval or disapproval of an ACP rests solely with the MDNR. There is no provision for EPA approval of Missouri ACPs. *See United States v. General Motors Corp.*, 702 F.Supp. 133 (N.D.Tex.1988) (interpreting SIP identical in this regard to Missouri SIP; no EPA approval required for Texas ACPs).

The United States' second argument centers on the requirements for a valid ACP. Specifically, the United States contends the Ford ACP does not satisfy 10–2.230(2)(C)(3) & (4), in that the ACP allows Ford to emit higher levels of VOCs than it would have been permitted under section (2)(B). Therefore, plaintiff argues, rather than an ACP

---

**5.** To buttress all of its arguments, the EPA argues we must defer to an agency's interpretation of the statute it enforces. Courts often do this. *See, e.g., Blum v. Bacon,* 457 U.S. 132, 141–42, 102 S.Ct. 2355, 2361–62, 72 L.Ed.2d 728 (1982). However, the basis for the deference also indicates its limitations: "[i]t is only logical that courts of general jurisdiction should give deference on matters that are more fully understood by specialist agencies." *Dow Chemical Co. v. EPA,* 605 F.2d 673, 681 (3rd Cir.1979). The issue here is not technical in nature; rather, it

simply addresses the question of when and where the EPA can challenge an ACP it does not agree with. It addresses the proper balance between the state's role and the EPA's role in the promulgation and enforcement of regulations under the Clean Air Act. "[W]here a statute strikes a political balance but administration of that statute is entrusted to an agency that may not embody that balance, it is dangerous to defer automatically to the agency's view." *Bethlehem Steel Corp. v. EPA,* 723 F.2d 1303, 1309 (7th Cir.1983).

it is an SIP *revision* and must be approved by the EPA. *See supra* note 3. The United States concludes that because this revision was not approved by the EPA it is not valid and, by default, Ford's compliance or noncompliance must be measured against section (2)(B).

There is a significant difference between a state's revision of an existing SIP and Missouri's approval of an ACP. The Act expressly provides that revisions of existing SIPs *must* be approved by EPA. EPA has never permitted, and probably could not permit, states to adopt SIP revisions on their own initiative. EPA, on the other hand, has granted Missouri discretion in adopting ACPs (which are best described as implementations of approved SIPs rather than revisions), provided the state agency empowered to approve the ACP concludes it provides for equivalent emissions. We must presume, absent evidence to the contrary, that Missouri exercised its discretion in good faith. Accordingly, if this grant of authority is to remain vital, it is this Court's opinion that judicial review of these plans, at least on the grounds and in the context advanced by EPA, must be precluded.

The Court has no quarrel with the United States' assertion that an ACP may not permit VOC emissions greater than those permitted by an approved SIP. This much is obvious from the ACP provision of Missouri's SIP and the Act itself. It would serve little purpose to enact an SIP only to have it undermined case-by-case by ACPs that permit excessive emissions. However, the Court does not view the equivalence of these two plans as the central issue. The issue raised by the EPA's argument is how the EPA can attack what it perceives to be a defective ACP. Obviously, the EPA believes it can pursue this issue in an enforce-

ment action against the source. The Court disagrees. It is this Court's opinion that because EPA delegated authority to Missouri to approve ACPs, and because Missouri acted in good faith in approving the plan, EPA's only recourse if it believes the ACP is substantially inadequate to attain NAAQS is to pursue revision of the ACP through administrative procedures.

Review of state-approved ACPs on the grounds advanced by EPA would undermine the provisions for ACPs in many state SIPs, whatever the outcome of that review.[6] No rational source would avail itself of an ACP if a court could invalidate that ACP in a judicial enforcement action at the behest of EPA. One need only remember why a source would propose an ACP to see the potential danger in the EPA's position. Because ACPs typically permit averaging of various source operations, it is likely, if not certain, that a source proposing an ACP has some operations that would not comply with the existing SIP.[7] Thus, it is unlikely that a source would avail itself of an ACP because of the potential exposure. As the action at issue demonstrates, the fact that the state approved a plan and found it equivalent to the EPA-approved plan would be meaningless. Every day of operation under an ACP would increase the penalty for its noncomplying operations. Consequently, the simple prospect of judicial review of these state-approved plans would effectively destroy the ACP provisions of many state implementation plans. Because EPA expressly delegated the authority to approve these alternate plans to Missouri, the Court will not adopt a position that will eliminate the ability to exercise that discretion.

The United States counters that only those sources that propose ACPs that per-

---

**6.** This result would hold true only for those alternate compliance provisions that do not require EPA approval. If EPA had required a provision for EPA approval of Missouri ACPs, and had in fact approved the ACP at issue, we would not be addressing this issue.

**7.** Indeed, if all the source's operations were in compliance with the SIP, there would be no need to propose an ACP.

mit emissions in excess of the approved SIP need fear such review. If the Court was convinced that the evaluation of emission limits was simply a matter of comparing two sides of an equation, that assertion might offer more comfort. However, review of the record reveals EPA has adopted differing positions on the calculation of the emission limits in 10–2.230(3).[8] In such a situation, it would be difficult to determine if the Ford ACP provides for emissions equivalent to EPA's vacillating interpretation of the SIP. Even if EPA consistently interpreted a SIP, it must be recognized that sources are relying on the *states'* determinations that their proposed plan sets emission limits equivalent to the states' own implementation plan. This state approval would be meaningless if EPA could collaterally attack the plan in a judicial or administrative enforcement action. Consequently, the United States' guarantee does nothing to warm the chilling effect judicial review will have on these plans.[9]

The Court would be more sympathetic to the United States' invalidity argument if there were no means by which EPA could rectify a deficient ACP. However, this is simply not the case. Because Ford's ACP is an implementation of the SIP, if, as the EPA surely must believe, Missouri's ACP is substantially inadequate to bring Kansas City into compliance with federal air quality standards, the EPA may request Missouri, after public comment, to revise the plan to bring it into compliance. § 110(a)(2)(H)(ii), 42 U.S.C. § 7410(a)(2)(H)(ii) (EPA may revise "[w]henever the administrator finds on the basis of information available to him that the plan is substantially inadequate to achieve [the goals of the Clean Air Act]"). If the state refuses to revise the plan in accordance with section 110(a)(2)(H)(ii), the EPA may revise the plan itself. § 110(c)(1)(C), 42 U.S.C. § 7410(c)(1)(C).[10] The Court holds that the ACP is the implementation plan applicable to Ford.

Having held that Ford's emissions must be measured against the ACP for purposes of a § 113 enforcement action, Ford asks the Court to find it in compliance with the

---

**8.** For example, EPA contends that even though section (3) is silent as to transfer efficiency, Ford agreed to a 50% transfer efficiency at the meeting in Durham. Consequently, it would appear EPA's position is that Ford must achieve the emission limits using 50% as its baseline transfer efficiency. This interpretation is stated in its pleadings. However, EPA's own internal policy, as well as the deposition testimony of its designated witness on enforcement filed in this case, state that in SIPs that do not provide for transfer efficiency *no* transfer efficiency is to be taken into account. In other words, compliance is to be measured only on the basis of the VOC content of the paint used, not the actual emissions. It is clear to the Court that EPA cannot state a consistent position on the interpretation of the emission limits at issue. How can a source be expected to propose or, more importantly, a state approve, an ACP that is equivalent to a limit EPA cannot consistently define?

**9.** In a similar argument, the EPA contends that Ford's proposal of an ACP allowing excessive VOC emissions, and the state's approval thereof, violate subsections 10.2–230(2)(C)(3) & (4) (emission limits in ACP may not be greater than allowed in the original SIP). The United States argues that accepting the ACP as valid would read these two subsections out of the regulation and, effectively, render them meaningless. The United States concludes that the only way to give these provisions meaning is to invalidate any ACP that permits emissions greater than the SIP permits.

The United States' position not only gives these two subsections meaning, it grafts a requirement of EPA approval on the section and further grants EPA the power to challenge the validity of an ACP in a compliance action against a source. The Court believes this gives these two subsections too much meaning. The more common sense interpretation is to accept the two subsections at face value: any ACP that allows excessive emissions is contrary to the Clean Air Act. Because the Act grants EPA the power to revise any SIP that is not furthering the Act, the two subject subsections simply state that ACPs are also subject to revision if they allow excessive emissions.

**10.** At oral argument, the Court posed the question to counsel for the United States why EPA had not brought suit against Missouri to bring this ACP into compliance with the Act. Counsel responded that the EPA and Missouri have settled their differences.

ACP as a matter of law. In support of this contention, Ford cites the undisputed evidence that the MDNR considers Ford to be in compliance with the ACP. Ford argues that this Court should defer to the state's interpretation of its own ACP. Consequently, Ford concludes, because Missouri finds Ford in compliance, this Court must find Ford in compliance as a matter of law.

Because such a holding would undermine the enforcement power expressly granted in the Act to the federal government, the Court cannot find Ford in compliance as a matter of law.

■ Once a SIP is in effect, its terms can be enforced by the federal government or the states. 42 U.S.C. §§ 7413(b), 7416. The legislative scheme of the Act under which the present action was brought expressly provides that the federal government may enforce a state's plan in federal court, a valid, approved SIP having the force and effect of federal law. *Union Electric Co. v. EPA*, 515 F.2d 206, 211 (8th Cir.1975), *aff'd*, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976). Ford's position would effectively bar EPA from instituting a suit pursuant to § 113 if the state concludes the source is in compliance with the SIP, even if EPA's independent evaluation reveals the source is not complying with the SIP.

As plaintiff correctly notes, such a holding by this Court would completely eviscerate the independent federal enforcement authority which is critical to ensure compliance with emission limits in the SIP. As Congress recognized, the tension between a state's concern for its environment and its desire to maintain and build an industrial base is ever present. Independent federal enforcement authority is critical to ensure that states do not relax their enforcement efforts in an attempt to attract industry.[11]

Ordinarily, all that would remain would be a trial on the issue of Ford's compliance with the ACP. However, the EPA's recalcitrance in recognizing the validity of the ACP has lead to its downfall in this litigation. The EPA has failed to plead a violation of the ACP in its complaint, and has failed to meet the notice requirements of § 113 with regard to any allegations of violations of the ACP. Consequently, summary judgment in favor of defendant is proper.

■ The Act is clear in its requirement that EPA must serve Ford with a notice of violation of the *applicable* implementation plan before it may proceed with either administrative or judicial enforcement proceedings. § 113(a)(1). The requirement is jurisdictional. Indeed, "the EPA is empowered to bring such a civil suit only on the basis of the *specific* violation alleged in the NOV and only where that *specific* violation alleged in the NOV continued for 30 days." *United States v. Louisiana–Pacific Corp.*, 682 F.Supp. 1141, 1155 (D.Colo.1988) (emphasis supplied). In general, the Court would be inclined to view the sufficiency of a NOV liberally.

However, in this case there were two *mutually exclusive* methods by which Ford could comply with the Act. Ford could choose to comply with the SIP as enacted or it could submit an ACP to the MDNR which, if approved by the MDNR, would control Ford's compliance. Ford is only subject to the state-approved ACP.

---

**11.** The parties have devoted extensive briefing and argument to the issue of interpretation of the SIP. Although the parties contend different plans control, now that the Court has ruled the ACP is valid, the arguments on compliance and how it is to be interpreted are again relevant. Ford obviously contends the Court is bound to accept the states' interpretation, while EPA contends that once an SIP is approved it is federal law and because EPA is charged with enforcing the provision the Court should defer to its interpretation. How compliance is measured under the ACP, and what weight is to be accorded Missouri's interpretation of its regulation, would be issues that would need to be resolved if this case went to trial. Because the Court is granting summary judgment in favor of defendant, however, this issue need not be addressed.

Ford is no longer subject to the requirements of section (2)(B).

Accordingly, if EPA alternatively wished to proceed against Ford for violations of the ACP, it was incumbent upon EPA to have served Ford with a notice of violation of the ACP. This EPA did not do. The two NOVs served on Ford could not be clearer: EPA was noticing violations of section (2)(B). While the NOVs do reference the SIP in general (which arguably could include the ACP), the notice goes on to reference the specific emissions limits of section (2)(B). Nowhere does the notice mention the ACP which was enacted pursuant to section (2)(C). Indeed, the first NOV expressly disavows the existence of a valid ACP. The obvious is confirmed in deposition testimony of Ms. Mindrup and Mr. Salman, EPA's designated expert witnesses on enforcement. Both witnesses acknowledge that when EPA prepared the NOVs, EPA completely disregarded the ACP. Further, EPA had knowledge that Ford was relying on the ACP because EPA reviewed the ACP, and subsequently disregarded it entirely, before filing the notices. EPA must have known Ford would claim it was only subject to the emission limits in the ACP and there was a possibility that the Court would sustain Ford's position. Consequently, EPA should have known it was necessary to separately notice violations of the two plans if EPA intended to proceed in the alternative.

Likewise, EPA has not plead a violation of the ACP in its complaint. Plaintiff asserted at oral argument and in its brief that if the Court finds the ACP controls, the EPA has also alleged a violation of the ACP and stands ready and able to proceed against Ford on that theory. However, defendant argues, and the evidence before the Court reveals, that no such theory has been plead by plaintiff. The Amended Complaint specifically references the emissions limits in section (2)(B) which the Court has held no longer apply to Ford. Further, every EPA representative has testified that the complaint was prepared without reference, and in fact completely disregards, the section (2)(C) plan. Because the Court has held Ford is no longer subject to section (2)(B), and because EPA did not plead a violation of the ACP, summary judgment is also proper on this ground.

■ Three minor issues remain to be resolved. First, plaintiff contends that the MDNR did not formally approve the ACP until 1987 and, accordingly, Ford is still liable under section (2)(B) for its violations prior to the approval of the ACP. Plaintiff is correct in its contention that until an ACP or SIP revision is approved, a source must comply with the original SIP. It is also true that the Director of the MDNR did not send a formal letter of approval to Ford until 1987. However, the evidence is undisputed that the MDNR considered Ford's ACP to be valid and in full force and effect in mid–1985. The Director acknowledges that the letter was not sent until 1987, but this was due to administrative oversight. The undisputed evidence before the Court reveals that the Ford ACP was considered valid and in force by the director of the MDNR in mid–1985.

Section (2)(C) of the SIP only requires the "approval" of the director of the MDNR, it does not specify what form that approval must take. The Court believes the evidence establishes that the ACP was approved in mid–1985, and that approval satisfies the requirements of Section (2)(C).

Second, plaintiff contends that the compliance date for the spray-prime operation was January 1, 1984 and, accordingly, it may proceed against Ford for violations of the spray-prime limits in section (2)(B) for the period between January 1, 1984 and the approval of the ACP. As a general proposition of law, EPA's position is correct. However, EPA cannot meet the jurisdictional requirement for such an action. Any action by EPA must be proceeded by a Notice of Violation. § 113. Furthermore,

the source must continue to violate the provision of the plan at issue 30 days after the notice is issued. *Id.*

Here, EPA noticed a violation of section (2)(B), which includes the limits for spray-prime. However, at the time of the notice, Ford was subject to the ACP limits and, accordingly, was no longer subject to the (2)(B) spray-prime limits. Because Ford was not subject to section (2)(B) it could not violate it, let alone continue to violate it 30 days after the notice was served. Consequently, plaintiff cannot proceed against Ford for violations of the spray-prime provision of section (2)(B) over the period at issue.

Finally, plaintiff argues Ford's final repair operation is still subject to the section (2)(B) emission limits. Plaintiff contends that the Ford ACP does not set emission limits for the final repair operation. Accordingly, plaintiff concludes, Ford is subject to the emission limit in section (2)(B) for this segment of its operation. Although that is one interpretation of the Ford ACP, the better interpretation includes final repair in the ACP. EPA's own witness, Ms. Mindrup, explains that the paint used by Ford in its final repair operation is the same paint that is used in the topcoat operation. EPA itself calculates final repair by ascribing 1% of the topcoat paint usage to final repair. The Ford ACP clearly covers paint usage for passenger and commercial topcoat. Because final repair emissions are an arithmetic 1% of topcoat emissions, *a fortiori* they are covered by the alternate compliance plan.

## II. MOTION TO DISMISS FORD'S COUNTERCLAIM

■ Ford's counterclaim alleges the EPA has adopted a national litigation strategy that has the force and effect of a regulation, but that this policy has not been enacted pursuant to the requirements of the Administrative Procedure Act. Ford contends the EPA, as a matter of internal policy, ignores valid ACPs when it institutes enforcement actions against sources. Ford argues that because this policy has the force and effect of law, and has not been properly promulgated, the Court should declare said policy invalid.

The United States counters that this Court is without jurisdiction to entertain such an attack. Defendant cites § 307(b)(1) of the Act, 42 U.S.C. § 7607(b)(1), in support of this proposition. Section 307(b)(1) vests jurisdiction in the Court of Appeals for judicial review of actions by the administrator. While the section does enumerate specific actions by the administrator that may be challenged in the appellate courts, it also includes any other "[f]inal action taken, by the Administrator under this chapter...." This phrase should be broadly construed. *Asbestec Constr. Services, Inc. v. U.S. E.P.A.,* 849 F.2d 765, 768 (2nd Cir.1988). Indeed, the Supreme Court has held it means precisely what it says—that all *final* agency actions taken under the Act are reviewable only in the Court of Appeals. *Harrison v. PPG Indus., Inc.,* 446 U.S. 578, 587–89, 100 S.Ct. 1889, 1895–96, 64 L.Ed.2d 525 (1980). After review of the factors that determine whether a particular agency action is final, *FTC v. Standard Oil Co. of Calif.,* 449 U.S. 232, 239–43, 101 S.Ct. 488, 493–95, 66 L.Ed.2d 416 (1980), the Court agrees with defendant that Ford's allegations, taken as true, present an attack on final agency action. Consequently, the Court agrees that it is without jurisdiction to entertain the instant challenge. Ford was permitted to present it's arguments against EPA's position on this issue in defense of EPA's enforcement action. If Ford wishes to take the offensive and attack EPA's policy in general, it must do so in the Court of Appeals. *See Solar Turbines Inc. v. Seif,* 879 F.2d 1073, 1077 (3rd Cir.1989).[12]

---

12. Likewise, Ford's challenges under the Mandumus and Venue Act, 28 U.S.C. § 1361, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706, are without merit. These remedies are available only when there is no reasonable alternative. As the Court has held, Ford can entertain this suit in the Court of Appeals.

In light of the above, it is hereby

ORDERED that plaintiff's motion for summary judgment is denied, defendant's motion for summary judgment is granted. Judgment shall be entered in favor of defendant on plaintiff's claim. It is further

ORDERED that plaintiff's motion to dismiss defendant's counterclaim is granted.