**NAVISTAR INTERNATIONAL TRANSPORTATION CORPORATION, Petitioner,**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 87–3474.

United States Court of Appeals, Sixth Circuit.

Argued March 1, 1988.

Decided Sept. 23, 1988.

Rehearing and Rehearing En Banc Denied Nov. 10, 1988.

James H. Schink, Jonathan B. Newcomb, Steven A. Smith argued, Kirkland and Ellis, Steven K. Covey, Navistar Int. Transp. Corp., Chicago, Ill., for petitioner.

Laurence M. Groner, Lee M. Thomas, EPA—General Counsel's Office, Pollution Control Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., EPA—Region V, Chicago, Ill., Karen L. Egbert [EPA] argued, Dept. of Justice, Land & Natural Res, Environmental Defense Sect, Washington, D.C., Stephen P. Mendoza, Chicago, Ill., for respondent.

Before KENNEDY and RYAN, Circuit Judges, and PECK, Senior Circuit Judge.

RYAN, Circuit Judge.

Petitioner, Navistar International Transportation Corporation (Navistar) (formerly International Harvester), seeks review of the decision of the administrator of the Environmental Protection Agency finding petitioner liable for violations of the Clean Air Act. We affirm.

I.

Navistar appeals the decision of the administrator (EPA) finding Navistar liable for violating § 120 of the Clean Air Act, 42 U.S.C. § 7420. Navistar operates a truck assembly facility in Springfield, Ohio.

Within the assembly plant are located ten "painting booths" which are used to paint the various parts which are manufactured or assembled at the plant. Following the painting, the parts are moved by conveyor into drying and baking ovens, with the exception of three painting booths which do not employ ovens. Six of the booths paint only metallic parts while four paint both metallic and other parts. Three of the booths are used to touch up paint which has been scratched or to paint areas that have been missed.

Pursuant to the Clean Air Act, the EPA has set National Ambient Air Quality standards (NAAQS). Each state is responsible for drafting a State Implementation Plan (SIP) to provide for implementation and enforcement of standards such as NAAQS. 42 U.S.C. § 7410(a)(1). The SIPs must be approved by the EPA and meet statutory requirements. A SIP must include "emission limitations, schedules, and time tables for compliance for such limitations, and such other measures as may be necessary to insure attainment." 42 U.S.C. § 7410(a)(2)(B). Emission limitations pursuant to a SIP are enforceable as federal law. 42 U.S.C. § 7410(d). Violators of the emission limitations can be penalized pursuant to 42 U.S.C. § 7420 which allows a penalty equal to the amount of economic benefit gained by delaying compliance with a SIP. "A brief but reasonably specific notice of noncompliance" must be sent to one not in compliance with a SIP. 42 U.S.C. § 7420(b)(3).

The particular regulation at issue here is contained within the Ohio SIP. Section 3745-21-09(U) of the Ohio Administrative Code provides, in pertinent part:

(U) Surface coating of miscellaneous metal parts and products.

(1) Except where exempted under paragraph (U)(2) of this rule, no owner or operator of a miscellaneous metal part or product coating line may cause, allow or permit the discharge into the ambient air of any volatile organic compounds from such coating line after the date specified in paragraph (C)(28) for rule 3745-21-04 of the Ad-

ministrative Code unless the requirements of either paragraph (U)(1)(a) or (U)(1)(b) of this rule are satisfied.

(a) The volatile organic compound content of each coating employed in the miscellaneous metal part or product coating line, as determined under paragraph (B) of rule 3745-21-10 of the Administrative Code, does not exceed the least stringent of any of the following limitations which are applicable:

.    .    .    .    .

(ii) 4.0 pounds per gallon of coating, excluding water, for a zinc rich primer coating;

(iii) 3.5 pounds per gallon of coating, excluding water, for an extreme performance coating;

On September 24, 1984, the EPA notified Navistar that it was not in compliance with the Ohio SIP, as its painting lines emitted pollutants beyond the emission limitations. The notice of noncompliance included a transmittal letter which stated the following were included in the notice package: (1) the notice of noncompliance, (2) a technical support document and an instruction manual, and (3) relevant code of federal regulations sections. The package, however, did not contain the technical support document nor the instruction manual. The notice informed Navistar it could either calculate the penalty owed and a payment schedule, or file a petition for reconsideration.

After three extensions, Navistar filed its petition for reconsideration on March 4, 1985. Navistar raised four issues: (1) that two painting lines were not within the definition of "coating lines," (2) that four painting lines were subject to the SIP refinishing exemption, (3) that four painting lines were not subject to regulation as they paint plastic as well as metallic parts, and (4) that the EPA was without jurisdiction due to insufficiency of the notice of noncompliance. A hearing was held before an Administrative Law Judge (ALJ) on March 4 and 5, 1986. The ALJ excluded evidence of technological and economic infeasibility in that it was irrelevant to the issue of liability. He held that the offer of proof on

economic infeasability evidence could be retained as proof on the penalty phase of the hearing.

The ALJ found Navistar in violation of the Ohio SIP (§ 3745–21–09)(U) of the Ohio Administrative Code). Navistar appealed to the administrator, who affirmed the ALJ's decision through the EPA's chief judicial officer. Navistar then sought review in this court.

## II.

### A.  *Sufficiency of Notice*

█ Before addressing the merits of Navistar's arguments regarding the proper interpretation of the Ohio SIP, it is necessary to discuss whether the notice of noncompliance sent to Navistar was defective to such a degree as to render the EPA without jurisdiction in this case. Section 66.12, describing the contents of a notice of noncompliance, states:

(a) Each notice of noncompliance shall be in writing and shall include:

(1) A specific reference to each applicable legal requirement of which the source is in violation;

(2) A brief statement of the factual basis for the finding of violation, together with a reference to any supporting materials and a statement of when and where they may be inspected.

(3) Instructions on calculating the amount of the penalty owed and the schedule for payments. Such instructions shall include (i) a statement of the date from which penalties should be calculated and (ii) a copy of the Technical Support Document and the Manual;

(4) Notice of the right to petition for a hearing to challenge the finding of noncompliance or to claim an exemption; and

(5) Notice that the penalty continues to accrue during the pendency of any hearings granted under this part or Part 67.

(b) Each notice of noncompliance shall be transmitted to the source owner or operator either by personal service or by registered or certified mail, return receipt requested.

40 C.F.R. § 66.12.

It is undisputed that the notice of noncompliance sent to Navistar did not contain the technical support document nor the instruction manual as required by 40 C.F.R. § 66.12(a)(3). Navistar argues that the omission of the material required by § 66.12(a)(3)(ii) renders the notice defective and leaves the EPA without jurisdiction in this case.

Several grounds require this court to reject Navistar's jurisdictional argument. First, § 66.12 provides no consequences for failure of the notice to comply with its requirements. Second, jurisdiction to assess noncompliance penalties is conferred upon the EPA pursuant to 42 U.S.C. § 7420. 42 U.S.C. § 7420(b)(3) requires only that a "reasonably specific notice of noncompliance" be sent.

Regulations under subsection (a) of this section shall—

. . . .

(3) require the States, or in the event the States fail to do so, the Administrator, to give a brief but reasonably specific notice of noncompliance under this section to each person referred to in subsection (a)(2)(A) of this section with respect to each source owned or operated by such person which is not in compliance as provided in such subsection, not later than July 1, 1979, or thirty days after the discovery of such noncompliance, whichever is later; …

42 U.S.C. § 7420(b)(3).

The notice sent to petitioner notified it of each painting activity that was in violation of the SIP. It notified petitioner of its rights under the statute and of a right to a hearing. The only documents missing had to do with penalty calculations which would not be relevant at the liability hearing pursuant to 40 C.F.R. § 66.41–43 but would be relevant only later at the penalty hearing pursuant to 40 C.F.R. § 66.51–54. Thus, the notice complied with the "brief but reasonably specific" requirement of 42 U.S. C. § 7420(b)(3).

Finally, *Brock v. Pierce County*, 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986), instructs that failure to follow all procedural requirements does not automatically render an agency without jurisdiction to proceed. In *Brock*, a statute required that the agency must make a final determination within 120 days after receiving the complaint. Although this requirement was in mandatory language, no consequences for failure to comply were listed. The Court found that the failure of the agency to meet the 120-day requirement did not divest it of the power to seek penalties under the statute. The Court stated:

> We would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake.

*Id.* at 255, 106 S.Ct. at 1839. Therefore, the failure of the notice of noncompliance to contain the instruction manual or the technical support document does not prevent the EPA from proceeding with the liability hearing.

### B. *Standard of Review*

Our standard of review in cases involving conflicting interpretations of an administrative regulation is to give considerable deference to the administrative agency's interpretation. *University of Cincinnati v. Heckler*, 733 F.2d 1171 (6th Cir.1984). "[A]n administrative agency's interpretation of its own regulation is accorded considerable deference on judicial review unless it is inconsistent with the terms of the regulation...." *Id.* at 1173–74.

Navistar argues that this court may subject administrative regulations to *de novo* review given the Supreme Court's decision in *INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). *Cardoza–Fonseca*, however, is limited in its scope and does not justify *de novo* review of the regulations at issue in the instant case. The *Cardoza–Fonseca* case, resolving conflicting interpretations of a statute enacted under the Immigration and Naturalization Act, involved the question whether the standards for withholding of deportation and granting asylum were identical. The Court held that the agency interpretation of a statute is a matter of construction for the Court where the agency interpretation is contrary to clear congressional intent, and the agency itself has given the statute inconsistent interpretations. *Cardoza–Fonseca*, 480 U.S. at 448, 107 S.Ct. at 1221–22, 94 L.Ed.2d at 457–58.

We note first that this case involves an agency's interpretation of a regulation and not a statute.

> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.
>
> . . . .
>
> When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.
>
> "Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 413–14, 89 L.Ed. 1700, 1702, 65 S.Ct. 1215 [1217 (1945)].

*Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

Second, Navistar has not shown that the EPA has been inconsistent in its interpretation of the Ohio SIP. Finally, the EPA's interpretation of the Ohio SIP is in keeping with congressional intent, as more fully discussed in section C below.

### C. *SIP Provisions Violated*

Navistar raises three arguments regarding the EPA's interpretation of the Ohio SIP. First, Navistar argues that two of its painting lines are not within the definition of "coating lines" for purposes of the SIP, because the painting lines do not have ovens for drying or baking. Signifi-

cantly, the two painting lines emit more pollutants than allowed by the emission limitations under Ohio Administrative Code § 3745–21.09(a), which limits emissions from "coating lines."

Coating line is defined in the Ohio SIP as follows:

"Coating line" means a series of one or more coating applicators, flash—off areas and ovens wherein a surface coating is applied, dried and/or cured.

Ohio Administrative Code § 3745–21–01(D)(8). Navistar argues that the definition requires that a coating line contain at least one applicator, one flash—off area, *and* one oven. If Navistar's interpretation is correct, the two painting lines are not "coating lines" for purposes of the Ohio SIP, because they do not have ovens. The ALJ found the definition ambiguous, in that it could be read to mean one or more applicators, *or* one or more flash—off areas, *or* one or more ovens, *or* any of the combination of the above. "The definition can result," the ALJ stated, "in a series of one." While we would not be inclined to read the sentence that way, we cannot say, as a matter of law, that the sentence is so crystal clear as to allow only the meaning given it by Navistar. Neither can we ignore the ALJ's finding that the Environmental Protection Agency received numerous inquiries from industry sources inquiring "whether or not ovens were required in order to come within the definition."

The ALJ's more compelling reason for finding the meaning of "coating line" ambiguous is the fact that Ohio Administrative Code § 3745–21–09(U)(1) regulates emissions resulting from the application of surface coatings described in both (U)(1)(a)(iii) "Zinc rich primer" coatings, and (U)(1)(a)(iii), "extreme performance" coatings. (Text quoted *supra*.) "Zinc rich primer" coatings, (ii), are not dried by ovens, but at in-plant temperatures, while "extreme performance" coatings, (iii), are oven dried. The definition of "coating lines" applies to both, however. This sug-

gests, as the ALJ held, that the listing of component elements in the definition of a coating line, should be read in the disjunctive not the conjunctive. We agree that the language defining "coating lines," is ambiguous.

A court may go beyond the express language of a statute or regulation to determine the intent of the draftsman if the language is ambiguous or if it would work against the purpose of the statutory goal. See *Int'l T & T Corp. v. General T. & E. Corp.*, 518 F.2d 913, 917–18 (9th Cir.1975). When that is done in this case, the intent of the regulation and the goals of the Clean Air Act provide further support for the agency's interpretation.

The ALJ heard testimony from the draftsman of the relevant portion of the Ohio SIP. The draftsman, Mr. Juris, testified that "coating lines" was meant to include painting booths without ovens.[1] Furthermore, one of the fundamental purposes of the Clean Air Act is to maintain air quality standards by requiring emission reductions of organic compounds from major sources. The two painting lines at issue emitted 315 tons of compounds in 1985, nearly 200 tons above the allowable level. It would be an anomalous result to interpret the regulation so as to exclude coating lines without ovens when they contribute so greatly to the undesired pollutants in the air that are to be reduced by the regulations.

Mindful "that an agency's ... interpretation of its own regulation is accorded considerable deference," *University of Cincinnati*, 733 F.2d at 1173, we find the ALJ's interpretation to be consistent with the terms of the regulation.

■ Second, Navistar argues that three of its painting lines are subject to the refinishing exemption of the Ohio SIP. Section 3745–21–09(U)(2)(c) of the Ohio Administrative Code exempts "application of a refinishing coating to motor vehicles." The ALJ found that the petitioner's processes do not involve refinishing.

---

1. The ambiguity over whether "coating lines" includes painting booths has been resolved by a subsequent revision of the language, according to the testimony of the draftsman.

Navistar's "refinishing lines" are used to correct paint defects on newly manufactured trucks prior to releasing them for sale. The EPA argues that the refinishing exemption does not apply to newly manufactured trucks but to body shops in the motor vehicle aftermarket.

Again, the intent behind the regulation supports the EPA's interpretation as evidenced by the testimony of the draftsman who stated that the refinishing exemption applies only to the motor vehicle aftermarket. In addition, the EPA has consistently interpreted the refinishing exemption to apply only to the aftermarket as evidenced by a 1981 letter to Navistar indicating that the exemption was not applicable to Navistar's operations. "Ordinarily we defer to an agency's consistent interpretation of its own regulations unless 'plainly erroneous or inconsistent with the regulations.'" *Patton v. National Mines Corp.*, 825 F.2d 1035, 1038 (6th Cir.1987) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).

Navistar responds that the regulations applicable to surface coating of automobiles and light duty trucks specifically exempt aftermarket body shops whereas the regulations applicable to surface coating of heavy duty trucks contain no such specific exclusion. The difference in language evidences an intent that the exemption governing surface coating of heavy duty trucks is not to be limited to the aftermarket, according to Navistar. However, because of the deference owed to an agency's interpretation of its own regulations, and because that interpretation is not inconsistent with the terms of the regulation, *University of Cincinnati v. Heckler, supra,* it must be upheld.

■ Finally, Navistar argues that four of its lines are used to paint metal and nonmetal parts. The emissions limitations of the SIP apply to "miscellaneous metal part or product coating lines." Section 3745–20–09(U)(1). One painting line uses five percent of its paint on non-metal parts; the other three painting lines use thirty-one percent of their paint on non-metal parts.

Emissions from these processes should be excluded from regulation, according to Navistar.

The EPA argues that "coating lines" are regulated by the SIP, and that petitioner's concession that the coating lines are used, in part, to paint metallic parts renders them subject to regulation.

The EPA's interpretation is consistent with the plain language of the SIP. Further, it is in keeping with the goal of the Clean Air Act to reduce emission of organic compounds from operations such as those employed by Navistar. Again, the deference due the agency's own interpretation requires this court to affirm the administrator's decision as to this issue.

### D. *Evidence of Technological and Economic Infeasibility*

■ Prior to the hearing before the ALJ, the EPA filed a motion *in limine* to exclude from the liability hearing evidence by Navistar of the technological and economic infeasibility of compliance with the SIP. The ALJ excluded the evidence from the liability hearing. He found, and the parties had earlier agreed, that the hearing before the ALJ was only to determine whether petitioner was liable for not being in compliance with the Ohio SIP. 40 C.F.R. § 66.41–43. A second hearing would be held to determine what the penalty for noncompliance would be. 40 C.F.R. § 66.41–54. The ALJ ruled that the evidence of infeasibility "may be retained in the record as an offer of proof on the issue of liability for a penalty (second stage of hearing)."

Technological and economic infeasibility arguments were first raised in *Union Electric Co. v. EPA,* 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976), by a petitioner who was challenging the SIP itself as opposed to that petitioner's compliance with the SIP. In that context, the Court held that technological and economic infeasibility arguments were not to be heard. The Court found that such a requirement would thwart the goals of and legislative intent behind the Clean Air Act. *Id.* at 269, 96 S.Ct. at 2351. The Court specifically left

open the question of whether due process requires the claims of technological and economic infeasibility be heard at some time. *Id.* at 269, n. 19, 96 S.Ct. at 2531 n. 19.

This court spoke to the due process issue in *United States v. Ford Motor Co.,* 814 F.2d 1099 (6th Cir.1987). In *Ford,* the company had challenged a SIP provision on infeasibility grounds in state court. This court held that a state court judgment does not preclude federal enforcement of the SIP. The company then argued that due process is violated by such a holding in that the state forum is the only forum in which to raise the infeasibility claims. This court stated:

> Ford's contention can best be answered by noting that the Clean Air Act envisions situations where standards currently economically or technologically infeasible will nonetheless be enforced. *See Union Electric Co. v. EPA,* 427 U.S. 246, 258–59, 96 S.Ct. 2518, 2526, 49 L.Ed.2d 474 (1976); *National Steel Corporation Great Lakes Steel Division v. Gorsuch,* 700 F.2d 314, 324–25 (6th Cir.1983). Congress has the authority to demand that "existing sources of pollutants either should meet the standard of the law or be closed down....", regardless of whether such standards are currently feasible. S.Rep. No. 91–1196, p. 2–3 (1970), quoted in *Union Electric Co., supra,* 427 U.S. at 259, 96 S.Ct. at 2526.
>
> In addition, we note that meaningful opportunities for raising claims of technological and economic infeasibility have been provided by the Act.
>
> ....
>
> [T]echnical infeasibility coupled with good faith efforts can be considered by the district court as a factor mitigating against the imposition of monetary penalties in the enforcement action.

*Ford Motor Co.,* 814 F.2d at 1103–04. *See also, United States v. Wheeling–Pittsburgh Steel Corp.,* 818 F.2d 1077, 1087 (3rd Cir.1987).

Given Congress' intent to obtain compliance or require that facilities be shut down, regardless of feasibility, and given that due process concerns are satisfied by allowing infeasibility arguments at the penalty stage, we affirm the ALJ's decision to exclude evidence of technological and economic infeasibility at the liability hearing. As the evidence was retained in the record for purposes of the penalty hearing, any due process requirements were met.

### III.

For the reasons stated above, the administrator's decision finding Navistar in violation of the Ohio SIP is AFFIRMED.