UNITED STATES of America,
Plaintiff,

Allegheny County Health Department,
Intervenor Plaintiff,

Group Against Smog and Pollution,
Intervenor Plaintiff,

v.

LTV STEEL COMPANY,
INC., Defendant.

No. CIV. A. 98–570.

United States District Court,
W.D. Pennsylvania.

Sept. 29, 2000.

Amy Reynolds Hay, U.S. Attorney's Office, Pittsburgh, PA, Daniel E. Boehmcke, U.S. E.P.A., Philadelphia, PA, Lois J. Schiffer, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, Lisa A. Cherup, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, DC, James M. Baker, U.S. E.P.A., Philadelphia, PA, for U.S.

Henry Miller, III, Allegheny County Health Dept., Pittsburgh, PA, for Allegheny County Health Dept.

Paul M. Pohl, John D. Goetz, Kevin P. Holewinski, Jones, Day, Reavis & Pogue, Pittsburgh, PA, for LTV Steel Co., Inc.

William V. Luneburg, University of Pittsburgh School of Law, Pittsburgh, PA, for Group Against Smog and Pollution.

William Roy Crum, Jr., Pittsburgh, PA, for Citizens Helping Our Cummunity, William D. Bellas, Frederick W. Crum, II, Gerald Thiry.

## MEMORANDUM ORDER

CINDRICH, District Judge.

The United States of America filed the instant civil action for penalties for defendant LTV Steel Company, Inc.'s ("LTV") alleged violations of certain Allegheny County Health Department ("ACHD") Rules and Regulations governing air emissions from coke oven batteries within Allegheny County. Pending before the court are several motions which we address below.

The facts as alleged in the complaint are as follows. LTV owns, and until February 28, 1998, operated, a coke production plant located in the Hazelwood Section of Pittsburgh, Pennsylvania (the "Pittsburgh Coke Works"). Air emissions from the Pittsburgh Coke Works were subject to Article XXI, Sections 2105.21(e) and 2105.21(f), and Article XX, Sections 520.F and 520.G of the ACHD Rules and Regulations. Article XXI governs emissions that occurred on or after July 12, 1996, and Article XX governs emissions that occurred before July 12, 1996.[1]

ACHD has been responsible at the local level for monitoring LTV's compliance with Sections 520 and 2105.21 at the Pittsburgh Coke Works, in coordination with the United States Environmental Protection Agency ("U.S. EPA"). Sections 520 and 2105.21 of the ACHD Rules and Regulations are part of Pennsylvania's State Implementation Plan (the "Pennsylvania SIP") which is a program designed to implement the Federal Clean Air Act (the "CAA"). See 40 C.F.R. Section 52.2020. Thus, Sections 520 and 2105.21 are federally enforceable under the CAA. 42 U.S.C. Sections 7413(a)(1) and (b)(1).

In the last quarter of 1994, ACHD inspectors detected a few pushing emissions violations. Such violations continued through 1995 and early 1996. In November 1996, U.S. EPA inspectors also observed numerous pushing emissions violations. In 1995, ACHD inspectors detected sporadic combustion stack emissions violations. In October and November 1996, U.S. EPA inspectors also observed combustion stack emissions violations.

U.S. EPA issued a Notice of Violation ("NOV") on March 6, 1997, informing LTV that it was in violation of Sections 520.F and 520.G. A revised NOV was issued by U.S. EPA on September 21, 1998, clarifying that the violations occurring before July 12, 1996 were governed by Sections 520.F and 520.G and that the violations on or after July 12, 1996 were governed by Sections 2105.21(e) and (f).

LTV permanently shut down all coke oven batteries at the Pittsburgh Coke Works on February 28, 1998. The United States commenced the instant suit under the CAA on March 25, 1998, to recover a civil penalty for the alleged air emission violations that occurred at the Pittsburgh Coke Works over the past few years.

---

1. Section 520 was recodified at Section 2105.21. There are no substantive differences between the specific subsections at issue here: new Section 2105.21(e)(4) and old Section 520.F.2 (which limit emissions from pushing operations at coke oven batteries) and new Sections 2105.21(f)(3) and (4) and old Section 520.G.2 and 3 (which limit emissions from combustion stacks for coke oven batteries). New section 2105.21 became federally enforceable on July 12, 1996. Thus, new Sections 2105.21(e) and (f) apply to the alleged pushing and combustion stack violations that occurred on and after July 12, 1996 and old Sections 520.F and 520.G apply to violations that occurred before July 12, 1996.

1) *LTV's Motion For Leave To File Supplemental Brief Instanter (Doc. No. 111)*

 LTV moves for leave to file a supplemental brief to its motion to dismiss.

LTV has already filed a brief in support of its motion to dismiss with supporting exhibits, and a reply brief, measuring approximately two inches in height. LTV now seeks to add an additional two inches in briefs and exhibits. A review of the proffered materials reveals that they add little to the already exhaustive presentation and discussion of issues contained in LTV's current submissions.

Accordingly, LTV's motion for leave to file a supplemental brief (Doc. No. 111) is **DENIED.**

2) *United States' Motion To Withdraw Exhibit To The United States' Response To LTV's Motion To Dismiss (Doc. No. 66) and LTV's Motion For Sanctions (Doc. No. 69)*

The United States filed a motion seeking the withdrawal of two of three affidavits it submitted in opposition to LTV's motions to dismiss. LTV opposes the withdrawal of the affidavits and moves to dismiss the United States' amended complaint with prejudice as a sanction for what it contends was the commission of a fraud on the court by the United States.

The three affidavits are as follows:

1) "Affidavit of Michael I. Ioff," attached as Exhibit 1 to the Exhibits In Support Of The United States' Response To LTV's Motion To Dismiss (Doc. No. 23) ("Affidavit No. 1")

2) "Affidavit of Michael I. Ioff," attached as Exhibit 3 to the Exhibits In Support Of The United States' Response To LTV's Motion To Dismiss The Amended Complaint (Doc. No. 59) ("Affidavit No. 2")

3) "Revised Affidavit of Michael I. Ioff", submitted on October 22, 1999 with the United States' Motion To Substitute Exhibit (Doc. No. 62) ("Affidavit No. 3")

Affidavit No. 1 was submitted in opposition to LTV's motion to dismiss the initial complaint, which was denied as moot in light of the United States' filing of a notice of intent to file an amended complaint. Affidavit No. 2 was submitted in opposition to LTV's motion to dismiss the amended complaint. Affidavit No. 1 and Affidavit No. 2 differ as to Mr. Ioff's educational credentials. In Affidavit No. 1, Mr. Ioff states that he holds "both a Bachelor of Science and a Master of Science degree in Civil/Structural Engineering for the University of Sankt–Petersburg, Russia ...." Affidavit No. 1 at para. 3. In Affidavit No. 2, Mr. Ioff states that he holds "a Diploma as Civil–Construction Engineer from the Leningrad Order of the Labor Red Flag Institution of Civil Engineering ... [and also] holds a Credential for successfully completing advanced courses for engineers from the Leningrad Order of Lenin State University (currently the University of Sankt–Petersburg) ...." Affidavit No. 2 at para. 3. In both Affidavit No. 1 and No. 2, however, Mr. Ioff states that his

> Diploma in engineering was evaluated by International Consultants of Delaware, Inc. (ICD) which is approved by the U.S. Office of Education as a provider of specialized services to evaluate foreign educational credentials for a comparable level of educational achievement in the United States [and that] ICD considered the Diploma to be the equivalent to a Bachelor of Science degree in the United States.

Affidavit No. 1 at para. 3 and Affidavit No. 2 at para. 3.

On October 22, 1999, the United States filed a motion to substitute Affidavit No. 2 with Affidavit No. 3, which the court granted. The United States indicated in the motion that the substitution was being sought to correct a few inaccuracies in Affidavit No. 2. Affidavit No. 3 differs from Affidavit No. 2 in two respects. First, Mr. Ioff further elaborates on his educational credentials stating:

I hold a Certificate from the Leningrad Order of Lenin State University, USSR (currently the University of Sankt–Petersburg, Russia) for successfully completing elected advanced courses for engineers.... As a result of my emigration, my copy of the Certificate remained in the USSR until 1985, when it was mailed to me. As a result of this delay, the Certificate was not submitted to ICD for evaluation and, consequently, was not considered in their evaluation process in 1983. As a whole, I consider my educational credentials equal to a Master's degree in Structural Engineering in the United States.

Affidavit No. 3 at para. 3.

The other difference in Affidavits No. 2 and No. 3 is with regard to Mr. Ioff's status as a certified smoke opacity reader. In Affidavit No. 2, Mr. Ioff states:

I have been certified as a smoke opacity reader by successfully completing an initial certification course in 1993, and thereafter semi-annual recertification courses conducted by personnel from the Air Pollution Training Program, Department of Environmental Sciences, Rutgers University, since 1993.

Affidavit No. 2 at para. 4. In contrast, Mr. Ioff states in Affidavit No. 3:

I am a certified smoke opacity reader. I initially obtained my certification course at the Environmental and Occupational Health Science Institute (EOHSI) affiliated with the Rutgers University in Piscataway, New Jersey on May 27–28, 1993. Since that time, I have successfully completed recertification courses on a semi-annual basis with one exception for the period from November 1997 through May 1998. The recertification courses were conducted by personnel from either EOHSI/Rutgers University or Eastern Technical Associates of Raleigh, North Carolina.

Affidavit No. 3 at para. 4.

Mr. Ioff was deposed by counsel for LTV on October 25 and 26, 1999, shortly after the filing of the United States' October 22, 1999 substitution motion. The United States indicated in the instant motion to withdraw Affidavit No. 2 and No. 3 that Mr. Ioff's deposition raised certain concerns regarding his credentials that the government wished to investigate. The United States maintained that it would report the results of the investigation to the court but in the meantime, the government was moving to withdraw Mr. Ioff's affidavits.

The United States recently filed the results of its investigation. *See* United States' Report To Court Concerning Michael Ioff (Doc. No. 113). The United States retained Orion Management International ("Orion"), a private investigation service, to investigate Mr. Ioff's credentials. Orion reports that records from the Leningrad Order of the Labor Red Banner Civil Engineering Institute, i.e., Leningrad Order of Lenin State University, indicate that Mr. Ioff received the equivalent of a Bachelor of Science in Civil Engineering with a 3.55 GPA out of a 4.00 scale. *See* Executive Summary of Orion's Report ("Orion Report") (Doc. No. 114) Att. 4. Orion also reports the results of the following four equivalency evaluations:

— An evaluation by ICD, referred to in Mr. Ioff's affidavits, concluding that Mr. Ioff has the equivalent of a Bachelor's degree in Structural Engineering.

— An evaluation by Evaluation Service, Inc., concluding that Mr. Ioff has the equivalent of a Master's degree in Civil Engineering.

— An evaluation by C.E.I. Specialist, concluding that Mr. Ioff has the equivalent of a Master's degree in Constructional Engineering Technology.

— An evaluation by Global Credential Evaluators, Inc., concluding that Mr. Ioff has the equivalent of a Bachelor of Science in Civil Engineering and verifying that he had completed additional post-graduate mathematics courses.

Orion Report at pp. 1–2. Orion also confirmed that Mr. Ioff is a licensed professional engineer in the State of New Jersey. *Id.* at p. 5.

As to Mr. Ioff's smoke opacity reader certification status, Orion identifies all periods for which Mr. Ioff was certified. *Id.* at pp. 4–5. In addition to the period from November 1997 through May 1998, identified by Mr. Ioff in Affidavit No. 3, Orion found no records verifying certification for two additional periods: Fall of 1993 through August 1994 and Fall of 1995 through April 1996. *Id.*

■ We find nothing in the current record which would indicate that the United States engaged in any conduct which warrants the imposition of any form of sanctions, certainly not the extreme sanction argued for by LTV. By all indications, the United States acted appropriately by promptly filing revisions to Mr. Ioff's affidavit. Moreover, the United States promptly moved to withdraw Mr. Ioff's affidavits and conducted an extensive investigation into Mr. Ioff's credentials when additional questions arose during his deposition.

Indeed, we do not share LTV's view on the significance of Mr. Ioff's revisions. What is regarded as a degree in one country may be called something else in different country even though the educational input underlying both designations is the same or substantially similar. Just so here. Although Mr. Ioff change the description of his post-graduate status from holding a Master's degree to a certificate, two of the four equivalency evaluations cited by Orion concluded that he had the equivalent of a Master's degree. Mr. Ioff consistently reported the results of the ICD evaluation, however, which was available to him at the time.

As to his reader certification status, Mr. Ioff's voluntary submission of Affidavit No. 3, in which he identifies the period that he

was not certified, belies a finding of an intentional misrepresentation. More importantly, as the United States points out, the Orion Report confirms that Mr. Ioff was certified at the time he took the opacity readings at issue in this case.

■ Thus, with the exception of the two additional periods of reader certification that were not verified, the Orion Report confirms the accuracy of Mr. Ioff's assertions in Affidavit No. 3. Although this one exception, and the fact that multiple affidavits were submitted, could play a part in the evaluation of Mr. Ioff's credibility or the weight to be accorded to his testimony, withdrawal the affidavits is not otherwise necessary. The United States has not indicated to the court, however, that it has changed its position on wanting these affidavits removed from the record.

Accordingly, the United States' Motion To Withdraw Exhibit To The United States' Response To LTV's Motion To Dismiss (Doc. No. 66) is **GRANTED** and LTV's Motion For Sanctions (Doc. No. 69) is **DENIED.**

3) *LTV's Motion To Dismiss The United State's Amended Complaint And The Intervenors' Complaints In Intervention (Doc. No. 51)*

LTV moves to dismiss the United States' and the intervenors' claims pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. LTV raises several issues in its motion which we address *seriatim.*[2]

■ In considering whether a complaint should be dismissed for failure to state a claim upon which relief can be granted, the court must consider only those facts alleged in the complaint and accept all of the well-pleaded allegations as true. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Unless the plaintiff can prove no

---

**2.** LTV states that although it references only the United States' complaint in its motion, its arguments apply equally to the Intervenors' complaints as they assert essentially the same

type of claims as those set forth in the United States' complaint. Accordingly, we refer only to the United States' complaint in our discussion of LTV's arguments.

set of facts in support of the claim that would entitle him to relief, the complaint should not be dismissed. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *D.P. Enters., Inc. v. Bucks County Community College,* 725 F.2d 943, 944 (3d Cir.1984).

### a) *Paperwork Reduction Act*

■ LTV argues that the United States' complaint should be dismissed because the Pennsylvania SIP and ACHD Rules and Regulations under which the suit was brought do not comply with the Paperwork Reduction Act ("PRA"), 44 U.S.C. Sections 3501 *et seq.* More specifically, LTV maintains that the PRA bars the assessment of a penalty for the collection of information by the United States unless the Office of Management and Budget ("OMB") approves the information collection request and assigns it a "control number." LTV contends that the Pennsylvania SIP and ACHD Rules and Regulations at issue here do not have the required control number.

LTV engages in an extensive, contortive analysis to create a PRA issue where none exists. The PRA does not preclude the United States from enforcing the substantive regulations at issue in this case.

The PRA was enacted to reduce the paperwork burden imposed upon the public by the federal government. *See* 44 U.S.C. Section 3501. The PRA charges the OMB with developing policies for efficient information processing and reducing the federal collection of information. *See* 44 U.S.C. Sections 3504, 3505, and 3511.

Before promulgating a regulation requiring the "collection of information," the PRA requires federal agencies to confirm that the information is actually needed, 44 U.S.C. Section 3506(c)(A), and then submit the proposed regulation to the OMB for approval, 44 U.S.C. Section 3507(a). The term "collection of information" is defined in the PRA as:

> the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for either-
>> (i) answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons, other than agencies, instrumentalities, or employees of the United States ....

44 U.S.C. Section 3502(3). If approved, the OMB assigns an approval number to the regulation which must be displayed upon the collection of information. 44 U.S.C. Section 3507(a)(3).

The PRA contains a provision that allows members of the public to use a federal agency's failure to comply with the PRA as a defense to claims relating to the failure to submit information. That provision, titled "Public Protection," states in relevant part:

> (a) Notwithstanding any other provision of law, no person shall be subjected to any penalty *for failing to comply with a collection of information that is subject to this chapter if-*
>> (1) the collection of information does not display a valid control number assigned by the [OMB] in accordance with this chapter;

44 U.S.C. Section 3512(a) (emphasis added).

Further clarification of the PRA's scope appears at Section 3518(e) which provides that:

> Nothing in this chapter shall be interpreted as increasing or decreasing the authority of the President, the Office of Management and Budget or the Director thereof, under the laws of the United States, with respect to the substantive policies and programs of departments, agencies and offices, including the substantive authority of any Federal agency to enforce the civil rights laws.

44 U.S.C. Section 3518(e).

Sections 520 and 2105.21, prohibit a person from operating, or allowing the operation of coke ovens except in compliance

with certain emission limits. These regulations contain no language that requires one to obtain, cause to be obtained, solicit, or require the disclosure to third parties or the public, of any facts or opinions by or for an agency. Not being able to ignore the absence of any such language, LTV advocates a more expansive view of the PRA's coverage arguing that the mere existence of Sections 520 and 2105.21 require it to collect information to determine whether it is in compliance with the regulations.

LTV cited no case where the PRA has been applied so broadly. Indeed, under LTV's rationale, virtually every regulation would be covered by the PRA, thus blocking federal agencies' efforts to enforce substantive regulations important to public health and safety. This could not have been Congress's goal.

It may be that if the United States were seeking penalties for LTV's failure to fulfill a regulatory obligation to collect information evincing compliance with Sections 520 and 2105.21, and such regulation did not have a requisite control number, the action would be barred. In this action, however, the United States is seeking penalties for LTV's alleged violations of emissions limits.

In sum, we hold that the PRA does not preclude the United States from pursuing the instant claims.

### b) Res Judicata

■ LTV argues that the United States' claim for any violations allegedly occurring in 1996 are barred by res judicata because it paid $3,325 to ACHD to settle the alleged violations occurring during this period. We disagree.

The settlement between LTV and ACHD was not a final judgment on the merits. Indeed, the settlement occurred prior to any judicial or administrative proceeding. The doctrine of res judicata does not, therefore, bar the United States' suit. *See In re: Continental Airlines*, 203 F.3d 203, 208 (3d Cir.2000) ("Claim preclusion requires a final judgment on the merits in

a prior suit involving the same parties, or their privities, and a subsequent suit based on the same cause of action.") Moreover, the United States was not in privity with ACHD. Apparently, U.S. EPA played no part in the settlement negotiations and is not otherwise a party to the settlement. Indeed, the CAA provides the U.S. EPA with separate concurrent enforcement authority. *See* 42 U.S.C. Sections 7413(a) and (b).

■ LTV also cites to Sections 111(c)(2) ("new sources") and 112(*l*)(7) ("hazardous air pollutants") of the CAA, 42 U.S.C. Sections 7411(c)(2) and 7412(*l*)(7), which contain express reservations of rights for the federal government to "overfile" a suit despite an earlier settlement by a state agency. LTV maintains that it is generally presumed that Congress acts intentionally when it includes particular language in one section of a statute but omits the same language from another section of the same Act. Because there is no similar overfiling provision in the section of the CAA at issue in the instant case, LTV argues that Congress intended to limit the United States' authority to enforce state promulgated SIPs.

■ A different rule of statutory construction is more appropriately applied here, however. A "fundamental rule of statutory construction is that effect must be given to every part of a statute or regulation, so that no part will be meaningless." *Sekula v. Federal Deposit Ins. Corp.*, 39 F.3d 448, 454 (3d Cir.1994). Section 113(e)(1) of the CAA, 42 U.S.C. Section 7413(e)(1), provides that:

> In determining the amount of any penalty to be assessed under this section, ... the court, as appropriate, shall take into consideration ... the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), *payment by the viola-*

*tor of penalties previously assessed for the same violation,* the economic benefit or noncompliance, and the seriousness of the violation.

(Emphasis added). If the instant suit were barred by LTV's and ACHD's settlement, that portion of Section 7413(e)(1) which instructs the court to consider any payments by a violator of penalties previously assessed for the same violation when determining an appropriate penalty would be meaningless.

In sum, we hold that the LTV and ACHD settlement does not bar the United States' claims.

### c) Pre–1996 Violations

■■■ LTV argues that this court lacks subject matter jurisdiction over any claims for pre–1996 violations because such violations were not specifically identified in the NOVs issued by the U.S. EPA as required by section 113 of the CAA, 42 U.S.C. Section 7413. We disagree.

■■■ The general five year statute of limitations for federal actions set forth at 28 U.S.C. Section 2462 applies to CAA actions seeking to recover civil penalties. A jurisdictional prerequisite to the U.S. EPA's filing suit, however, is that it comply with the CAA's notice requirement at 42 U.S.C. Section 7413(a)(1). Section 7413(a)(1) requires the U.S. EPA to give the person alleged to be in violation of "any requirement or prohibition of any applicable implementation plan or permit," and the state, 30 days notice before commencing a lawsuit for violations of the SIP, i.e., issue a NOV.

"Courts generally view the sufficiency of an NOV liberally." *See United States v. AM Gen. Corp.* 808 F.Supp. 1353, 1362 (N.D.Ind.1992) (citing *United States v. Ford Motor Co.,* 736 F.Supp. 1539, 1550 (W.D.Mo.1990)); *Navistar Int'l Transp. Corp. v. U.S. E.P.A.,* 858 F.2d 282, 285–86 (6th Cir.1988) (NOV that identified each activity that was in violation, rights under statute, right to a hearing was sufficient). "The only effect of a NOV is to make the recipient aware that the 'definitive' regula-

tions are not being met, and to trigger the statutory mechanism for informal settlement negotiations before further action is taken." *AM General,* 808 F.Supp. at 1362.

As to the availability of penalties for pre-NOV violations, the court in *United States v. SCM Corp.,* 667 F.Supp. 1110, 1122 (D.Md.1987) explained:

The civil penalty provisions of the Act provide incentive to the violator to expeditiously resolve emissions violations. A violating source can avoid civil penalties if it ceases violation within 30 days of the NOV. Failure to comply within 30 days can result in the assessment of substantial penalties for each day of violation. The availability of penalties for pre-NOV violations enhances the incentive to resolve emission problems. More importantly, it provides incentive to avoid violations all together. Assessment of civil penalties for post-NOV violations only allows the source to wait until it is caught before making serious efforts to "clean up its act." Once the NOV is issued, the violating source could perform a cost/benefit analysis, weighing the benefits of operating in violation, without expenditures for further pollution control, against the potential cost of $25,000 per day of violation; a cost that may never be realized or at best will be collected only after an uncertain and time consuming litigation process. Such a practice is certainly not consistent with Congress' Clean Air objectives. Potential penalties for pre-NOV violations add a substantial and less calculable weight to the cost side of the analysis.

The United States correctly distinguishes *United States v. Pan American Grain Mfg. Co.,* 29 F.Supp.2d 53 (D.Puerto Rico 1998), the only case cited by LTV in support of its position. In *Pan American,* U.S. EPA had issued an NOV to the defendant that operated three facilities. Reference was made to a particular regulation in the NOV's general introductory section, but only one of the three facilities

was identified as being in violation of the referenced regulation. The U.S. EPA later filed suit seeking penalties for violations at all three facilities. The court dismissed all claims for violations at the two facilities that had not been identified in the NOV as being in violation of the regulation, however, finding that the court was without jurisdiction to hear such claims because the NOV was not sufficiently specific.

In contrast, the NOV's issued by U.S. EPA in this case identify the plant in violation; the regulation being violated; and the specific emissions sources at the plant in violation. Indeed, LTV does not maintain that it is unclear as to what regulations were allegedly being violated at what plant.

In sum, we hold that the court has jurisdiction over claims for the alleged pre-1996 violations, i.e., the pre-NOV violations.

### d) *Violations Based On CEM Data*

■ LTV argues that the United States cannot seek penalties for any violations based on Continuous Emissions Monitoring ("CEM") data because such data has not become an approved method of determining compliance with the ACHD's SIP. We disagree.

As previously noted, Section 113(e)(1) of the CAA, 42 U.S.C. Section 7413(e)(1), provides that:

> In determining the amount of any penalty to be assessed under this section . . . the court, as appropriate, shall take into consideration . . . the duration of the violation as established by any credible evidence *(including evidence other than the applicable test method)* . . . .

(Emphasis added); *See Sierra Club v. Public Serv. Co. of Colorado, Inc.,* 894 F.Supp. 1455, 1459–60 (D.Colo.1995) (summary judgment granted on violations of opacity standard contained in Colorado SIP, based upon CEM data alone, notwithstanding the fact that the Colorado SIP specified a different approved test method); *see also L.E.A.D. v. Exide Corp.,* 1999 WL 124473 (E.D.Pa.1999) (court found CEM data probative of violations of Pennsylvania SIP opacity standard).

Thus, we hold that the United States can seek penalties for violations based on CEM data.[3]

Accordingly, LTV's Motion To Dismiss (Doc. No. 51) is **DENIED.**

4) *United States' Motion To Compel LTV To Respond To Requests For Admissions And Interrogatories (Doc. No. 92) and LTV's Motion To Compel Discovery (Doc. No. 104)*

Both the United States and LTV have outstanding motions to compel discovery. The court will hear argument on these motions at the below scheduled status conference.

A status conference shall be held on October 13, 2000 at 10:30 a.m., Room 1014, United States Post Office and Courthouse, Seventh Avenue and Grant Street, Pittsburgh, Pennsylvania.

---

**3.** We also note that the United States maintains that it has several sources of proof of LTV's violations independent of the CEM data. We would not, therefore, dismiss any claims for alleged violations that refer to CEM data at this stage of the litigation.